R. L. ROTHSTEIN CORPORATION, Appellant, v. KERR STEAMSHIP COMPANY, INC., Respondent, et al., Defendants.

First Department, July 2, 1964.

464

*William C. Woodson* of counsel (*James J. Regan* with him on the brief; *Sherpick, Regan & Davis*, attorneys), for appellant.

*John H. Cleveland, III* of counsel (*John C. Moore* with him on the brief; *Haight, Gardner, Poor & Havens*, attorneys), for respondent.

BREITEL, J.  Plaintiff Rothstein, holder of a mate's receipt for a quantity of tallow, appeals from so much of an order as denied its motion for partial summary judgment, pursuant to CPLR 3212.  It sued, among others, respondent Kerr, the carrier's general agent, for conversion because it issued an ocean

bill of lading for the tallow to another in violation of the terms of the receipt.

The issue is whether a condition in the mate's receipt bound the carrier and its agent, Kerr. The condition stipulated that no bill of lading would be issued by the carrier or its agent unless the mate's receipt was first surrendered.

The order should be reversed. Plaintiff is entitled to summary judgment for the value of its security interest in the tallow, as it may be assessed. There are no material issues of fact as to the custom in the tallow trade, since the condition in the mate's receipt was expressly stipulated. Nor is it material that the tallow had been sold by plaintiff so that it had not retained the general ownership, but only a security interest.

The tallow was worth about $84,000. Before the carrier's agent, Kerr, was ever involved in the transaction the tallow had been the subject of four sales contracts:

1) Jacob Stern & Sons, Inc., of Philadelphia    to R. L. Rothstein Corp., of New York

2) R. L. Rothstein Corp.    to Allied Crude Vegetable Oil Refining Corp. of Bayonne, N. J.

3) Allied Crude Vegetable Oil Refining Corp.    to Western Vegetable Oils Co., Inc., of San Francisco

4) Western Vegetable Oils Co., Inc.    to United Arab Republic

Rothstein paid cash against certain documents, including the mate's receipt, to Stern. Rothstein had made a similar contract with Allied for purchase by cash against documents (but without specifying the kind of document of title). It was never paid, because Allied went into notorious insolvency, and later into bankruptcy, while the tallow was en route between Philadelphia and Egypt on the carrier's vessel. After the ship had left, and before the sale to Rothstein was executed, the carrier's agent issued a "shipped" bill of lading to Western although the mate's receipt was never surrendered to it.

Western, the fourth seller, had arranged through its east coast forwarding agent for carriage of the tallow on the vessel operated by Kerr's principal. Stern, the first seller, delivered the tallow to the vessel, presenting a mate's receipt prepared by Rothstein's shipping agent. The receipt provided in upper case typescript on its face in prominent isolation:

"OCEAN BILL OF LADING TO BE RELEASED ONLY AGAINST SURRENDER OF THIS MATE'S RECEIPT PROPERLY ENDORSED",

and again, in print, at the bottom, just above the receiptor's signature:

"Bill of Lading may be obtained from the vessel's master or owner or agent **only against surrender of the duly signed and endorsed original** of this mate's receipt." (Boldface as in original.)

The receiving mate of the vessel signed the receipt and retained a copy with the identical stipulations in like prominence.* The mate's receipt, as required by the second seller Rothstein, was noted in the name of the first seller Stern for the account of the fourth seller Western. The receipt was thereafter endorsed in blank by Stern.

As provided in the agreement between the first seller Stern and the second seller Rothstein, the documents (mate's receipt and certificates of quantity and quality) were presented through Bank Leumi Le-Israel, B.M. for payment. This was done and Rothstein received the documents. This occurred November 15, 1963, after the vessel had sailed, and after the carrier's agent, Kerr, had issued the bill of lading on November 6, 1963 in breach of the conditional mate's receipt. In standard form the bill of lading recited that the agent Kerr signed the bill of lading "For The Master" of the vessel.

In the ordinary course, the third seller Allied would have paid the second seller Rothstein before receiving the documents, and it in turn would have been paid by the fourth seller Western, also upon presenting the documents. Instead, the carrier's agent, Kerr, had issued the "shipped" bill of lading to Western without surrender of the original mate's receipt, after the vessel had left port and was bound for Egypt, thus by-passing the security chain based on the mate's receipt. How this happened is never explained except that the "shipped" bill of lading was picked up by Western's forwarding agent which had arranged for the carriage in the first instance, and that the vessel had never advised the carrier's agent, Kerr, in New York, of the issuance of the conditional mate's receipt.

To escape liability for the contretemps or the fraud practiced by someone in this chain transaction, defendant Kerr argues that a mate's receipt is not treated as a document of title in the tallow trade, however it may be considered in other trades, and that in any event Rothstein had no title in the tallow upon which it could base a claim in conversion, once it had sold the tallow.

---

* As to a conspicuous term or clause, see Uniform Commercial Code, § 1–201, subd. (10), eff. September 27, 1964.

Defendant Kerr misconceives the commercial and legal aspects of the transaction. The effect of the mate's receipt does not depend upon any custom, because the delivery of the tallow and the issuance of the receipt depended instead upon an explicit stipulation. Parties may contract expressly in accordance with a custom, contrary to a custom, or in absence of a custom (Restatement, Contracts, § 246, esp. Comment *c*; § 247, esp. Comment *d*; cf. Uniform Commercial Code, § 1–205, subd. [4]). In such case, the express agreement governs and the existence or absence of a custom is immaterial. Nor is a conversion confined to the beneficial or general ownership of goods; there may also be a conversion of goods by invading a right to possession retained as a security interest.

A mate's receipt is not a unique document. Indeed, mate's receipts have a long history. Actions for conversion have been based upon such receipts even in the absence of the stipulation present here, but based upon a custom requiring a surrender of the receipt before the goods or a bill of lading for them may be issued (*Brower* v. *Peabody*, 13 N. Y. 121; *Blossom* v. *Champion*, 37 Barb. 554; *The Ferreri*, 9 F. 468, affd. 14 F. 589; *Ruck* v. *Hatfield*, 5 B. & Ald. 632, 106 Eng. Rep. [Full Reprint] 1321; *Craven* v. *Ryder*, 6 Taunt. 433, 128 Eng. Rep. [Full Reprint] 1103).

The *Brower* case is significant. Instead of an express stipulation, as here, a custom to the same effect was established. The mate's receipts which were given to the sellers by the captain of the vessel were stolen by the purchaser who used them to obtain the bill of lading from the owners of the vessel. The Court of Appeals held that the captain, the only appearing defendant, was guilty of conversion on failure to deliver the goods to the sellers on demand. The court described the receipts as " evidences of * * * title * * * which gave them [the sellers] absolute control of the property " (13 N. Y. 121, 125). It stated the purchaser was guilty of a felony in stealing the receipts since they " were property, and the value of the commodity affected or transferable by the instrument " would be deemed the value of the article stolen (*id.*, p. 126). In the *Blossom* case, the court, in sustaining the seller's right to recover, also based upon the usage, pointed out that a wise precaution to buttress the implicit custom would be to express the condition in the receipt, exactly as was done here.

These precedents, because they depend upon a custom, go further than the requirements of this case. The instant mate's receipt stipulated that the carrier or its agent would not issue a bill of lading unless the original mate's receipt was first sur-

rendered. Since the mate's receipt is perhaps not a negotiable document of title it may well be that, under modern conditions, the stipulation was essential. There is commercial and legal logic to support the notion that the issuance and possession of a mate's receipt, without custom or stipulation, or any other receipt, in the possession of a third party will not prevent the delivery of the goods or a negotiable document of title covering such goods to one having the apparent right to possession (see, e.g., Uniform Commercial Code, § 2–505, incl. A. L. I. Comments 3 and 4 *; Carver, Carriage of Goods by Sea [10th ed.], pp. 40–42, 70; Thompson, Bills of Lading, pp. 21–23).

Defendant Kerr stresses that in this case Western, the fourth seller, to whom it delivered the bill of lading, was the one for whose account the tallow was loaded into the vessel, without reservation by the shipper and first seller Stern of a security interest by taking a negotiable bill of lading in its own name (cf. Uniform Commercial Code, § 2–505, subd. [1], par. [a]).

The simple fact in this case, nevertheless, is that the mate's receipt by the stipulation of the parties controlled the issuance of the bill of lading, and thus indirectly the goods. To that extent it served as a document of title, at least between immediate parties to the receipt. (See *Brower* v. *Peabody, supra*; Uniform Commercial Code, §§ 1–201, subd. [15], incl. A. L. I. Comment 15, §§ 7–101-7–105.) Hence, the provision in the Stern-Rothstein and Rothstein-Allied contracts of sale for "cash against documents". Or, better, for the time being, the mate's receipt served as a temporary assignable substitute for the ocean bill of lading to be issued directly to Western as shipper and the U. A. R. as consignee, but only after cash was paid for the mate's receipt. By the condition in the mate's receipt, expressly stipulated, the carrier was a party to this mode of protecting the seller's interest.

That plaintiff Rothstein may not have been the general owner of the tallow, because it had sold specifically appropriated goods, is immaterial. An unpaid seller may retain a right to possess the goods as a security interest (Personal Property Law, § 101; cf. Uniform Commercial Code, §§ 2–401, 2–505, incl. A. L. I. Comments 3 and 4, § 2–507). By issuing the bill of lading which stands in stead of the goods, and thereby conferring a right of the possession to the goods on another, defendant Kerr effectively converted the tallow in derogation of plaintiff Rothstein's

---

* A. L. I. refers to the American Law Institute — National Conf. of Comrs. on Uniform State Laws Official Text of the Uniform Commercial Code. See Uniform Commercial Code (U. L. A.) where the official text and comments are reprinted.

possessory security interest (cf. *Suzuki* v. *Small,* 214 App. Div. 541, 556, affd. 243 N. Y. 590; *Shippee* v. *Pallotti, Andretta & Co.,* 117 Conn. 472; *Market State Bank* v. *Farmers Sav. Bank,* 190 Iowa 1112, 1118; *Fourth & Cent. Trust Co.* v. *Aker Bros.,* 39 Ohio App. 247; *Danzas, Ltd.* v. *National Bank of Alaska,* 222 F. Supp. 671, 676 [D. Alaska]; Restatement, Torts, § 234, incl. Comments; 5 N. Y. Jur., Bailment, § 39).

Defendant Kerr has argued that the function of the mate's receipt is to protect the carrier and not the shipper or owner of an interest in the goods. Thus, it has referred to a carrier's right under the Carriage of Goods By Sea Act (U. S. Code, tit. 46, § 1303, subds. [3], [7]) to require a shipper to surrender any documents of title previously taken up before receiving a bill of lading from the carrier. Reference to the Federal act proves only that a carrier may protect itself by demanding a surrender of prior documents of title before issuing a negotiable bill of lading.

After the arrival of the vessel in Egyptian waters but before it was completely discharged of its cargo, plaintiff notified defendant Kerr of the situation, demanded cancellation of the bill of lading, and withholding of the cargo. These facts add little, and nothing essential, to plaintiff's right to recover against Kerr. By that time the issuance by the carrier's agent, Kerr, of the negotiable bill of lading was a completely effective conversion. Under conventional rules, Kerr, although an agent of a disclosed principal, is liable (Restatement, Agency 2d, § 349; 2 N. Y. Jur., Agency, § 291).

Accordingly, the order insofar as it denied plaintiff's motion for summary judgment against defendant Kerr Steamship Company, Inc., should be reversed, on the law, with costs to plaintiff-appellant against defendant-respondent, and an assessment of damages directed. Settle order on notice.

BOTEIN, P. J., RABIN, STEUER and STALEY, JJ., concur.

Order, entered on April 7, 1964, insofar as it denied plaintiff's motion for summary judgment against defendant Kerr Steamship Company, Inc., unanimously reversed, on the law, with $20 costs and disbursements to appellant, and an assessment of damages directed.

Settle order on notice.