Morris MERWIN et al., Plaintiffs and Appellees,

v.

Silver ZIEBARTH, Defendant and Appellee,

Kenneth Olson and Ole A. Tenold, Defendants and Appellants,

and

Gary McKechney, Defendant.

Civ. No. 9269.

Supreme Court of North Dakota.

March 31, 1977.

Rehearing Denied April 25, 1977.

Reichert, Howe, Hardy, Moench, Galloway & Jorgensen, P. C., Dickinson, for plaintiffs and appellees; argued by Dale W. Moench, Dickinson.

Maurice R. Hunke, Dickinson, for defendant and appellee.

Mackoff, Kellogg, Kirby & Kloster, P. C., Dickinson, for defendants and appellants; argued by Gordon W. Schnell, Dickinson.

Forsgren & Stefonowicz, Crosby, for Ole A. Tenold; argued by F. Leslie Forsgren, Crosby.

ERICKSTAD, Chief Justice.

This is a case involving the interpretation and enforceability of a contract for the sale of cattle. The Uniform Commercial Code, Title 41, N.D.C.C., is controlling as to a majority of the issues.

David Merwin, Morris Merwin, and Roger Wilson are partners in Merwin Farms, a ranching and cattle-feeding business located at Haynes, North Dakota. As David Merwin acted for this partnership in the transactions giving rise to this case, further reference to David Merwin shall be deemed to refer to the partnership. Kenneth Olson is a farmer and livestock dealer from Estevan, Saskatchewan, and Ole Tenold is a grain and cattle farmer from Torquay, Saskatchewan. Silver Ziebarth is a rancher, semen dealer, and cattle buyer from Scranton, North Dakota.

Merwin, Olson, Tenold, and Ziebarth were all in attendance at a meeting held in South Dakota in February of 1974, the subject of which was a new breed of cattle known as "Beefalo". This meeting was organized by a man named Bud Basolo, who does business under the name of Texas Meat Brokerage, Inc. Merwin later became associated with Basolo in a manner not fully developed in the record. He apparently became involved in the distribution of Beefalo semen and Beefalo cattle for Texas Meat Brokerage, Inc. After the South Dakota meeting, which was held in February of 1974, Olson, Tenold, and Ziebarth visited Merwin at Merwin's ranch in Haynes several times. It appears that at these meetings the Beefalo breed and other breeds of so-called "exotic" cattle raised by Merwin were discussed. These meetings were all held in 1974 between early spring and late summer.

Sometime during this period, a document was drawn up by Merwin and signed by Olson. The contents of this document are set forth in full as follows:

"Ken Olson agrees to purchase the following from Merwin Farms under the terms stated.

"250 Commercial Heifers Bred Beefalo
$450 per head

"100 ½ Simmental Heifers Bred Simmental Ueli Acajou
$1400 per head

"12 ½ Simmental cows Bred Simmental Ueli Acajou with ¾ Heifer Calves at side
$4000 a pair

"28 ½ Simmental cows Bred Simmental Ueli Acajou
$1800

"39 ¾ Simmental heifers Bred Simmental Ueli Acajou

6500

"Heifers will be bred from May 15 thru July 15 and cows from June 11 thru July 31. Seller will furnish identification, breeding dates and semen used identification.

"Seller will have all cattle pregnancy tested and provide health clearances into Canada by a licensed Veterinarian.

"Buyer will purchase 120 $^{3}/_{16}$ hybrid heifers from Texas Meat Brokerage at $1,000 per head by paying 20% down before July 1, 1974 and balance in January 1974.

"Buyer will pay $20,000 to Merwin Farms immediately and an additional 20,-000 by July 15, 1974 as partial down payment.

"Buyer will deliver 4,800 in cash to Merwin Farms monthly for 10 months beginning in July, 1974 as partial payment.

"Buyer will pay 36,000 to Merwin Farms in August as partial down payment. *Signed* = Kenneth *Olson*"

Most of the issues of this case center around this document.

The introductory language preceding the cattle list is hand-printed, while the rest of the document is written out in longhand. Olson claims that the printed part was added after he signed the document. There is also a dispute as to when this document was drawn up and signed. While Olson maintains that the document is merely an option allowing him to purchase cattle, Merwin claims that it is a contract.

The trial court, in considering the evidence including the oral testimony in its findings of fact, found that a contract existed and that it was written and signed on June 18, 1974.

A total of 242 Beefalo bred commercial cattle were shipped by Merwin to a Canadian port of entry on September 24 and 30, 1974. These cattle were received by Tenold at the border. No attempt was made to reject these cattle nor has their acceptance been revoked. There is no issue as to whether these cattle were contracted for.

It is, however, disputed whether there was a contract to purchase the bred Simmental heifers and cows listed in the document set forth above.

Some time in October of 1974, Olson indicated to Merwin that he would not purchase the Simmentals. On December 20, 1974, Merwin sent identical notices to Ziebarth, Olson, and Tenold, informing them that they were in default of an agreement to purchase cattle and that Merwin intended to sell the cattle, holding them liable for the deficiency between the contract price and the sale price. The cattle were sold at an auction sale held at Schnell Livestock Auction in Dickinson, North Dakota, on February 4, 1975. There appears to be no claim in this appeal that the sale was not made in good faith and in a commercially reasonable manner.

Merwin brought suit against Olson, Tenold, Ziebarth, and Gary McKechney, who is involved in a partnership with Olson in Canada. A judgment was entered against Olson and Tenold only, in the sum of $255,-549; the complaint against McKechney and Ziebarth being dismissed by the judgment. The manner in which this sum was arrived at is not an issue in this appeal.

Olson and Tenold appeal from the judgment of the district court, setting forth several issues of law and fact for our review. Silver Ziebarth is an appellee in this case as Olson and Tenold appeal from that part of the judgment dismissing the complaint as to Ziebarth. The dismissal of the complaint as to Gary McKechney is not appealed from.

## I. ENFORCEABILITY OF THE CONTRACT

The trial court has made findings of fact that a written instrument for the sale of certain cattle was signed on June 18, 1974, by Kenneth Olson and that that instrument was intended by the parties to be a contract for the sale of those cattle, and not an option. These findings have support in the record and we hold them not to be clearly erroneous. Rule 52(a), N.D.R.Civ.P.

In order for this contract to be enforceable, it must comply with the statute of frauds provision of the Uniform Commercial Code, which reads in pertinent part:

"1. Except as otherwise provided in this section a contract for the sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing." § 41–02–08(1), N.D.C.C. (U.C.C. § 2–201(1)).

■ *Comment* 1 to Section 2–201 of the U.C.C., sets forth only three definite requirements a written memorandum must have to comply with this section: (1) it must evidence a contract for the sale of goods, (2) it must be signed by the party to be charged, and (3) it must specify a quantity. The district court properly found that the writing of June 18 met these requirements, although note that Olson was the only identified party. Thus, the U.C.C. Statute of Frauds has been satisfied. We reject the contention of Olson and Tenold that the more restrictive test set forth in *Johnson v. Auran,* 214 N.W.2d 641 (N.D. 1974), is applicable to the U.C.C. Statute of Frauds. The *Johnson* case initially arose from a contract for the sale of investment securities; *i.e.,* stock in a car dealership. In conjunction with this contract, the purchaser of the dealership sent a letter to the seller offering to employ her as a goodwill representative of the dealership for a time not to exceed five years in exchange for payment to her of $100 per month over the five-year period and the use of a new car yearly for the rest of her life. This letter was interpreted with reference to a non-Code statute of frauds provision, Section 9–06–04, N.D.C.C. Neither party argued that this was a transaction in goods and it was not treated as such. *See* Section 41–

02–02, N.D.C.C. (U.C.C. § 2–102); Section 41–02–05, N.D.C.C. (U.C.C. § 2–105). Non-Code law is, of course, to be utilized to supplement the provisions of the U.C.C. This is only to be done, however, in situations where non-Code law has not been displaced by a particular U.C.C. provision. *See* § 41–01–03, N.D.C.C. (U.C.C. § 1–103). It is apparent from the comment to Section 2–201 of the Code that this is a relaxed statute of frauds section and is carefully drafted as such. To apply the law of *Johnson v. Auran, supra,* to a transaction in goods would violate the policy of the Code.

■ There was much evidence received as to oral terms to the contract. The court found that some of these claimed terms existed and that others did not. As there was no finding that the writing was intended to be a complete and exclusive statement of the terms of the agreement, it was not improper to accept evidence of consistent additional terms, though they were not evidenced by a writing. Section 41–02–09, N.D.C.C. (U.C.C. § 2–202). Thus, the findings of the court that the cattle were to be delivered by November 1, 1976, and that the balance of the purchase price was to be paid upon the delivery of the cattle were based upon admissible evidence and were not clearly erroneous.

The trial court also found "that the quantity of the cattle was not definite in that the Defendants were to purchase bred cattle, and the Plaintiffs were to breed the cattle within the time limits and furnish so many as 'settle' up to the total limit of the Contract." This would seemingly make the contract an "output" contract, as described below:

"1. A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded."

§ 41–02–23(1), N.D.C.C. (U.C.C. § 2–306(1)).

There is some restriction on what type of evidence may be used to explain or supplement a written term:

"Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

1. by course of dealing or usage of trade (section 41–01–15), or by course or performance (section 41–02–15); and

2. by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement." § 41–02–09, N.D.C.C. (U.C.C. § 2–202).

■ As the district court made no finding that the terms in question were intended by the parties to be a final expression of their agreement, parol evidence need not be restricted to course of dealing, usage of trade, and course of performance. The court referred to parol evidence to find the meaning of the quantity term. Since it appears from the evidence that it is highly improbable that Merwin could have produced the quantity of bred cattle indicated by the writing, and since the course of performance on the Beefalo contract shows that fewer cattle than indicated on the writing were, in fact, accepted, this finding was not clearly erroneous.

## II. ENFORCEABILITY AS TO TENOLD

The trial court found that Olson and Tenold were to share the profits and losses as to the commercial cattle bred Beefalo; that Merwin and Tenold were in phone contact; that Tenold never disclaimed any partnership; that Tenold received the cattle bred Beefalo at the border; and made other findings of fact regarding occurrences taking place after June 18, 1974. Based upon these findings, the trial court concluded that there was a contractual and ostensible partnership between Olson and Tenold and that Olson signed the agreement of June 18 for himself and as an agent of Tenold. In so concluding, the court was in error.

■ Tenold himself testified that he and Olson reached a partnership agreement on June 19, 1974, one day after the execution of the contract. All the other positive evidence of such partnership stems from events after June 18. There was thus no basis upon which to find actual partnership prior to June 19, 1974.

■ The trial court found also that there was an "ostensible partnership" between Olson and Tenold. As we shall develop more fully, the concept of "ostensible partnership" is essentially equivalent to the concept of "partnership by estoppel" defined in Section 45–06–08, N.D.C.C.

There seems to be some confusion as to these terms, probably because the Compiled Laws of 1913 used the term "ostensible partnership". Section 45–06–08, N.D.C.C., *supra*, as part of the Uniform Partnership Act became part of the North Dakota Century Code in 1959. In *Schlichenmayer v. Luithle*, 221 N.W.2d 77 (N.D.1974), this court used the language "ostensible partnership" and relied on *Oelkers v. Pendergrast*, 73 N.D. 63, 11 N.W.2d 116 (1943), a case decided under the old law. A reading of both *Schlichenmayer* and *Oelkers* illustrates that whatever term is used, there is but one concept and that concept is based upon the principles of estoppel. To be consistent with the Century Code, we shall speak of a "partnership by estoppel".

■ Both *Schlichenmayer* and *Oelkers* say that proof of a partnership by estoppel, if circumstantial, must be inconsistent with any other reasonable hypothesis than the existence of a partnership. 221 N.W.2d at 82; 11 N.W.2d at 119.

■ The trial court makes no finding of circumstances prior to June 18, 1974, which indicate partnership by estoppel and which

would be inconsistent with any other reasonable hypothesis. The only testimony pertinent to that subject is that there was not an actual partnership until June 19. Merwin's conclusory testimony that he believed there was a partnership is not enough in the absence of supportive evidence. Indeed, the written contract drawn up by Merwin does not mention a partnership, but says "*Ken Olson* agrees to purchase the following . . . ." (Emphasis added.) It cannot be said that, in contracting to sell the cattle on June 18, 1974, Merwin relied upon acts of Tenold occurring *after* that date. Tenold was neither an actual partner nor a partner by estoppel on June 18, 1974. The trial court then erred in not dismissing the complaint as to Tenold.

### III. EFFECT OF DEFECTIVE BEEFALO SHIPMENT

■ Olson and Tenold urge that the shipment of Beefalo bred heifers was defective and thus they could accept the Beefalo and reject the Simmentals, even though the Simmental shipment was not defective. Section 41–02–64, N.D.C.C. (U.C.C. § 2–601), read alone, could be interpreted to allow this:

"Subject to the provisions of this chapter on breach in installment contracts (section 41–02–75) and unless otherwise agreed under the sections on contractual limitations of remedy (sections 41–02–97 and 41–02–98), if the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may

1. reject the whole; or
2. accept the whole; or
3. accept any commercial unit or units and reject the rest."

However, when that section is read in conjunction with Section 41–02–75, N.D.C.C. (U.C.C. 2–612), it becomes obvious that this is not a good argument:

"1. An 'Installment contract' is one which requires or authorizes the delivery of goods in separate lots to be separately accepted, even though the contract contains a clause 'each delivery is a separate contract' or its equivalent.

"2. The buyer may reject any installment which is nonconforming if the nonconformity substantially impairs the value of that installment and cannot be cured or if the nonconformity is a defect in the required documents; but if the nonconformity does not fall within subsection 3 and the seller gives adequate assurance of its cure the buyer must accept that installment.

"3. Whenever nonconformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole. But the aggrieved party reinstates the contract if he accepts a nonconforming installment without seasonably notifying of cancellation or if he brings an action with respect only to past installments or demands performance as to future installments."

By accepting the non-conforming installment without notification of cancellation due to the defects in that installment, the whole contract is deemed reinstated. Section 41–02–75(3), N.D.C.C. (U.C.C. § 2–612(3)). It would be incongruous to allow the defendants to retain an installment, yet reject future installments because of an alleged defect in the retained installment.

### IV. MISREPRESENTATION ISSUE

■ Olson and Tenold argue that they were induced into buying the Beefalo bred heifers by misrepresentation. Whether this would affect the Simmental portion of the contract need not be reached. The trial court found that there were no facts indicating that Merwin had made any misrepresentations to Olson and Tenold regarding the Beefalo breed of cattle. Any possible misrepresentation would have been by Bud Basolo, the developer of the Beefalo breed, and not by Merwin. The trial court's finding was not clearly erroneous. Rule 52(a), N.D.R.Civ.P.

### V. ENFORCEABILITY AS TO ZIEBARTH

■ Olson and Tenold disagree with the trial court's finding that Ziebarth was not

**200**

their partner as to this contract. Ziebarth maintains that as a procedural matter, an unsuccessful defendant has no grounds to appeal the dismissal of a complaint as to the successful defendant. Regardless of how this procedural question might be resolved, we find that the record supports the trial court's finding that Ziebarth was not a partner of Olson as to this contract. As discussed with regard to Tenold's participation in negotiations prior to June 18, there is insufficient evidence to support a finding that there was either a partnership or a partnership by estoppel involving Ziebarth prior to that date.

For the reasons stated in this opinion, the judgment appealed from is reversed as to Ole Tenold and affirmed in all other respects. It should be noted that in this opinion we are not deciding any rights which may exist between the defendants, because those issues were not raised, briefed or argued.

SAND, PAULSON, PEDERSON and VOGEL, JJ., concur.