The PEOPLES BANK AND TRUST, a corporation, formerly known as Peoples State Bank, of Parshall, North Dakota, and Donald Olson, Plaintiffs and Appellees,

v.

Marvin J. REIFF, d/b/a Gambles No. 4698, Parshall, North Dakota, and Anita M. Reiff, Defendants and Appellees,

and

Gamble-Skogmo, Inc., a Foreign Corporation, Defendant and Appellant.

Civ. No. 9303.

Supreme Court of North Dakota.

July 27, 1977.

Bosard, McCutcheon, Kerian, Schmidt & Holum, Minot, for defendant and appellant; argued by Jon R. Kerian and Robert S. Rau, Minot.

Bair, Brown & Kautzmann, Mandan, for plaintiffs and appellees; argued by Malcolm H. Brown, Mandan.

ERICKSTAD, Chief Justice.

This appeal involves the priorities of Gamble-Skogmo, Inc., The Peoples Bank and Trust of Parshall, North Dakota (hereinafter the Bank), and Donald Olson, secured creditors of Marvin J. Reiff, d/b/a Gambles No. 4698.

In July of 1972 negotiations were entered into by Olson and Spidahl, Inc., Donald Olson (a shareholder in that corporation), The Peoples Bank and Trust (formerly known as Peoples State Bank) of Parshall, North Dakota, Gamble-Skogmo, Inc., and Marvin J. Reiff. At that time Reiff purchased from Olson and Spidahl, Inc., a hardware store, Gambles No. 4698, located in Parshall, North Dakota. On July 5, 1972, Reiff and his wife Anita executed a promissory note to the Bank in the sum of $46,300.

On July 7, 1972, Reiff and Gamble-Skogmo entered into a "security agreement and wholesale credit agreement", the terms of the security agreement granting to Gamble-Skogmo a security interest in "All inventory of goods and merchandise now in the possession of, or hereafter acquired by the Debtor which is held for sale or lease in connection with the Debtor's business", as well as the proceeds of such collateral. A financing statement relating to the security agreement was filed in the office of the North Dakota Secretary of State on July 20, 1972, at 3:30 p.m. as file No. 34,662.

Reiff executed two separate security agreements, dated October 1, 1972, in favor of the Bank, and on the same day signed a renewal promissory note for the $46,300. One security agreement, before us as plaintiffs' exhibit 2, stated as security "all inventory and accounts receivable", and checked off as collateral several items on the printed form, including personal property held for sale or lease, documents of title, accounts, contract rights, proceeds, and after-acquired property. The other security agreement, before us as plaintiffs' exhibit 3, lists as collateral "all furniture and fixtures of the Gamble Store No. 4698 located on lot 5, block 17, original townsite, Parshall, North Dakota." A financing statement relating to this collateral was filed with the North Dakota Secretary of State on November 2, 1972, at 11:00 a.m. as file number 36,436.

A subordination agreement was entered into on July 12, 1972, under the terms of which the Bank agreed to subordinate its claims against Reiff to those of Gamble-Skogmo. The agreement contained the following language: "The Subordinated Creditor agrees to and does hereby unconditionally, but subject to the terms, conditions and provisions herein (and in any RIDER annexed hereto and executed on behalf of Gambles) set forth, subordinate its claims against the Debtor . . .." This agreement was signed by Gary Lerberg for the Bank and by Marvin Reiff. Jim Isaak, an employee of Gamble-Skogmo, witnessed the signatures of Lerberg and Reiff. His signature did not indicate that he was signing for Gamble-Skogmo as a party.

By the terms of the subordination agreement the Bank agreed not to accept payment of the subordinated indebtedness until all of the superior indebtedness owed to Gambles shall have been paid in full. This document set no limit on the amount of subordinated indebtedness.

On December 11, 1973, a rider to the subordination agreement was executed by Reiff, the Bank, and Gamble-Skogmo. The operative part of that rider reads:

"Anything in the Subordination Agreement to the contrary notwithstanding, it is hereby mutually agreed that the provisions of the Subordination Agreement shall only apply to that portion of the Superior Indebtedness (as that term is defined in the Subordination Agreement) up to and including the first Fifteen thousand_ _ _ _Dollars ($15,000.00) thereof unpaid from time to time; and that *the priority of the remainder of the Superior Indebtedness unpaid from time to time shall be determined in accordance with the provisions of Article 9 of the Uniform Commercial Code, as adopted by the state wherein the Debtor's business is located.*" [Emphasis added.]

On May 15, 1974, Reiff issued a promissory note to the Bank in the sum of $15,000. Gary Lerberg, an officer of the Bank, testified that this $15,000 loan was made at the request of Gamble-Skogmo, so that Reiff could use the money to reduce his indebtedness to Gamble-Skogmo.

In early December of 1975, Gamble-Skogmo entered into possession of Gamble Store No. 4698 and began to liquidate assets of that store. Money from this liquidation was deposited to the account of Gamble-Skogmo, Inc. at the Peoples Bank & Trust of Parshall. The Bank refused to allow checks to be drawn on Gamble-Skogmo's account, and brought this action by summons and complaint dated December 30, 1975. Donald Olson was also a plaintiff in this action, brought against Marvin Reiff, Anita Reiff, and Gamble-Skogmo, Inc. Gamble-Skogmo answered and brought a

counterclaim (which counterclaim was dismissed after trial and is not a subject of this appeal).

At the close of the trial, the district court for Mountrail County concluded that Gamble-Skogmo, by execution of the rider dated December 11, 1973, waived its priority in filing against Reiff for any money due it in excess of $15,000. The court, in its judgment, made the following determination of priorities with respect to the assets of ·Marvin Reiff in Gamble Store No. 4698:

"1. Gamble-Skogmo, Inc.—The first $15,000.00.

"2. Peoples Bank and Trust—$42,951.60 together with interest until paid.

"3. The defendant, Gamble-Skogmo, Inc. until the balance of its $57,000.00 indebtedness is paid less the amounts already collected of $28,932.41.

"4. The plaintiff, Donald Olson.

"5. Any sums remaining after payment in full of the above shall be and remain the property of the defendant, Marvin J. Reiff, d/b/a Gamble Store No. 4698."

Gamble-Skogmo appeals from this judgment.

The crux of Gamble-Skogmo's argument on appeal is that the rider to the subordination agreement did not operate to waive its priority against Reiff as to sums in excess of $15,000.

It has been the contention of the Bank, both at trial and on appeal, that it was the intention of the parties, in executing the rider, that the claim of the Bank be subordinated to that of Gamble-Skogmo only in the amount of $15,000. Gary Lerberg testified on behalf of the Bank that this was his intention, and that past transactions between Gamble-Skogmo and the Bank involving similar subject matter had been so limited, though this testimony was objected to by Gamble-Skogmo as violative of the parol evidence rule. The following letter was offered into evidence and was received over the objection of Gamble-Skogmo:

"October 24, 1973

"Marvin Reiff
Parshall, North Dakota 58770

"Dear Marv:

"I have a copy of your subordination agreement. This apparently doesn't indicate any limit on Gambles' subordination. My understanding was that we had a $15,000 limit. Perhaps you could clarify this.

"I'm sure SBA will not approve this agreement in its present form and perhaps next time you are here, we could get together and have an understanding of this because we definitely want some top limit on this because it is now open ended and that would be no good as long as we have the largest encumbrance on the stock.

"Sincerely,

"Gary L. Lerberg
Cashier

"GLL:jz

"cc: Jim Isaak, Zone Superintendent
Gambles
5445 Wayzata Boulevard
Minneapolis, Minnesota 55440"

The trial court had before it evidence from which it could well have concluded that the Bank intended that there be a $15,000 limit on the subordination agreement. We must determine whether some form of parol evidence rule applies to this situation and, if so, what the scope of its application would be.

As the substance of the subordination agreement is not a "transaction in goods", it is questionable whether it is within the scope of Chapter 41–02, N.D.C.C. (Article 2 of the U.C.C.) and the parol evidence rule stated in Section 41–02–09, N.D.C.C. (U.C.C. § 2–202). See Section 41–02–02, N.D.C.C. (U.C.C. § 2–102). This question need not be resolved in the instant case because Section 41–02–09 N.D.C.C. and Section 9–06–07, N.D.C.C. are compatible. See Section 41–01–19, N.D.C.C.

Recognizing that the U.C.C., although specifying areas of exclusion and inclusion, nowhere delineates its general scope, we must determine whether the general provisions of Article 1 (Chapter 41–01, N.D.C.C.), relate to the subordination agreement involved in this case.

Section 41–01–02(1), N.D.C.C. (U.C.C. § 1–102(1)), states that the U.C.C. "shall be liberally construed and applied to promote its underlying purposes and policies." A comment to that section thus speaks of extending the coverage of broad acts:

"[Courts] have recognized the policies embodied in an act as applicable in reason to subject-matter which was not expressly included in the language of the act, . . . They have done the same where reason and policy so required, even where the subject-matter had been intentionally excluded from the act in general. . . . "

Uniform Commercial Code § 1–102, Comment 1.

At least one treatise perceives Article 1 as relating to commercial transactions not covered in the other articles:

"Article 1 thus has a two-dimensional significance: it states basic concepts and definitions that run through all the remaining articles of the Code and for most courts it states basic principles which are applicable to commercial transactions outside of the area of the Code proper."

1 Anderson, Uniform Commercial Code § 1–101:3 (2d ed. Supp.1977).

The Supreme Court of Georgia viewed the passage of the U.C.C. by the legislature of that state as evincing an intent that it control all commercial transactions. *City Dodge, Inc. v. Gardner,* 232 Ga. 766, 208 S.E.2d 794 (1974).

Several courts, though recognizing given subject matter as not being included in its provisions, have extended the principles of the U.C.C. to those areas by analogy. *E.g. Hillis v. Meister,* 82 N.M. 474, 483 P.2d 1314 (1971); *Vitex Manufacturing Corp. v. Caribtex Corp.,* 377 F.2d 795 (3d Cir. 1967).

■ Section 41–01–19, N.D.C.C. (U.C.C. § 1–209), states that a subordination agreement does not create a security interest, and a comment to that section states that

"The enforcement of subordination agreements is largely left to supplementary principles under Section 1–103 [§ 41–01–03, N.D.C.C.]." Uniform Commercial Code § 1–209, Comment 4.

However, since (1) the rider to the subordination agreement specifically referred to Article 9 of the U.C.C., (2) the agreement and rider are interwoven with transactions specifically covered by the U.C.C., *e.g.* sales of goods and security transactions, and (3) subordination by agreement is specifically contemplated by Section 41–09–37, N.D.C.C. (U.C.C. § 9–316), we hold that the provisions of Chapter 41–01, N.D.C.C. (Article 1 of the U.C.C.), are applicable in this case. We believe this to be the proper approach, whether under a theory of direct application or application by analogy.

Having determined that the general provisions of the U.C.C. apply, we hold that our statutory, non-U.C.C. parol evidence rule is nonetheless applicable with regard to the subordination agreement and rider thereto as a supplementary general principle of law. This is so because of the following section of the U.C.C. as adopted by our legislature.

"Unless displaced by the particular provisions of this title, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions." § 41–01–03, N.D.C.C. (U.C.C. § 1–103).

*See* U.C.C. § 1–209, Comment 4, *supra.*

Our general statutory parol evidence rule reads:

"The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument." § 9–06–07, N.D.C.C.

This statute and the cases construing it, are, however, to be modified in cases covered by Article 1 of the U.C.C., where "course of dealing" or "usage of trade" are in issue. We so conclude because of the following section of the U.C.C. as incorporated into our law.

"1. A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

"2. A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. If it is established that such a usage is embodied in a written trade code or similar writing the interpretation of the writing is for the court.

"3. A course of dealing between parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement.

"4. The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade." § 41–01–15, N.D.C.C. (U.C.C. § 1–205).

■ Under this section, 41–01–15, N.D.C.C., the parol evidence rule in Section 9–06–07, N.D.C.C., may not be applied to preclude relevant evidence of course of dealing or usage of trade, as an intelligent interpretation of the agreement requires that the court familiarize itself with the commercial setting. *Chase Manhattan Bank v. First Marion Bank,* 437 F.2d 1040 (5th Cir. 1971).

Gary Lerberg testified that in similar prior dealings between Gamble-Skogmo and the Bank involving Gambles No. 4698, subordination agreements signed by the Bank in favor of Gamble-Skogmo had a dollar limit, and that Gamble-Skogmo had not, to his knowledge, filed financing statements as to previous operators. Though Lerberg testified that the previous subordination agreements had $15,000 limits, he did not say what happened as to claims exceeding that figure. (He did not say that Gamble-Skogmo would then be subordinate to the Bank or that the filing of a financing statement by Gamble-Skogmo was prohibited by such agreements.) There was no offer of previous written agreements as evidence nor was it claimed that there arose any situations such as this one where the limiting term had to be construed. With regard to the transactions involving Reiff's operation of the store, Lerberg testified that there was an "understanding" among himself, Reiff, and Jim Isaak, the zone manager for Gamble-Skogmo, that the subordination agreement would be limited to $15,-000.

■ Section 41–01–15(3), N.D.C.C., supra, states that a course of dealing shall "give particular meaning to and supplement or qualify terms of an agreement." This does not disturb an essential thrust of the parol evidence rule that an unambiguous term may not be contradicted by parol. *Watson v. Kresse,* 130 N.W.2d 602 (N.D. 1964); *Mevorah v. Goodman,* 79 N.D. 443, 57 N.W.2d 600, 49 A.L.R.2d 825 (1953). See *Smith v. Michael Kurtz Construction Co.,* 232 N.W.2d 35 (N.D.1975); *Dardis v. Eddy Brothers,* 223 N.W.2d 674 (N.D.1974). Section 41–01–15(4), N.D.C.C., supra, is also consistent with this principle in that it states that when the course of dealing or usage of trade bring about an unreasonable construction of the express terms, the express terms shall control both course of dealing and usage of trade.[1] *Lipschutz v. Gordon Jewelry Corp.,* 373 F.Supp. 375 (S.D. Tex.1974); *Martin v. Ben P. Eubank Lumber Co.,* 395 S.W.2d 385 (Ky.1965); *R. L. Rothstein Corp. v. Kerr Steamship Co.,* 21 A.D.2d 463, 251 N.Y.S.2d 81 (1964).

In order to determine whether the parol evidence received in this case was properly

---

1. We perceive no evidence of usage of trade on the record. We note that any such evidence would be improper if offered without due notice to the other party. Section 41–01–15(6), N.D.C.C. (U.C.C. Section 1–205(6)).

applied, we must determine whether it explained, qualified, or supplemented the written terms of the rider, without bringing about an unreasonable construction of the express terms.

In *Modine Mfg. Co. v. North East Independent Sch. Dist.*, 503 S.W.2d 833 (Tex.Civ. App.1973) (a case which, though involving Article 2, interprets Section 1–205 of the U.C.C.), it was held to be error not to allow evidence of usage of the trade to explain a contract term specifying the capacity of air-conditioning equipment. The court held that evidence of a trade usage of allowing reasonable variations in cooling capacity was improperly excluded even though a written term specified a definite figure. Without approving or disapproving the holding in *Modine,* we note that in that case the express term in question setting forth the specification, although qualified by trade usage, was not deemed to be negated by the evidence of trade usage, but by way of explanation, was, at the most, varied.

■ In the instant case, the language of the rider that "the remainder of the superior indebtedness unpaid from time to time shall be determined in accordance with the provisions of Article 9 of the Uniform Commercial Code . . . " is totally inconsistent with the parol evidence of an agreement granting superiority to the Bank as to any claims in excess of $15,000. Construing that language as granting the Bank superiority would be an unreasonable construction of that language. Thus, even in the light of course of dealing, the language of the rider is unambiguous, inasmuch as the essence of the parol evidence submitted by the Bank was contradictory rather than explanatory.[2] Accordingly, under Section 41–01–15(4), N.D.C.C. (U.C.C. § 1–205(4)), *supra,* because it is unreasonable to construe the express language and the parol evidence as consistent, the express terms of the rider must control.

We note that several sections of Article 9, including some pertinent to this case, have been amended subsequent to the transactions giving rise to the issues in this case. The appropriate provisions in effect at that time shall apply.

Gamble-Skogmo argues that its priority is established as that of a purchase money secured party under the following section, as it was written prior to its revision becoming effective January 1, 1974:

"3. A purchase money security interest in inventory collateral has priority over a conflicting security interest in the same collateral if

a. the purchase money security interest is perfected at the time the debtor receives possession of the collateral; and

b. any secured party whose security interest is *known* to the holder of the purchase money security interest or who, prior to the date of the filing made by the holder of the purchase money security interest, had filed a financing statement covering the same items or type of inventory, has received notification of the purchase money security interest before the debtor receives possession of the collateral covered by the purchase money security interest; and

c. such notification states that the person giving the notice has or expects to acquire a purchase money security interest in inventory of the debtor, describing such inventory by item or type." § 41–09–33(3), N.D.C.C. (U.C.C. § 9–312(3)).

It is Gamble-Skogmo's view that both it and the Bank are purchase money secured parties under this section and that Gamble-Skogmo had no knowledge of the Bank's security interest. It maintains that the Bank was required to notify Gamble-Skogmo of its security interest, as Gamble-Skogmo had made the prior filing. We have much difficulty following this reasoning,

---

2. We do not reach the issue, in this case, of whether evidence of negotiations leading to a particular agreement, where this is the first such transaction between the parties, may be

admitted as "course of dealing". *See Sun River Cattle Co. v. Miner's Bank of Montana,* 164 Mont. 237, 521 P.2d 679 (1974).

inasmuch as we cannot see how, under these facts, both Gamble-Skogmo and the Bank could be purchase money secured parties as to the same inventory. We first must point out that the assumption that the Bank has a purchase money security interest in the inventory is without basis. "Purchase money security interest" is defined as follows:

"A security interest is a 'purchase money security interest' to the extent that it is

1. taken or retained by the seller of the collateral to secure all or part of its price; or

2. taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral *if such value is in fact so used."* [Emphasis by the Court.] § 41–09–07, N.D. C.C. (U.C.C. § 9–107).

The definition provided by this section, especially when read in light of its comments, would seemingly preclude a finding that the Bank held a purchase money security interest in inventory purchased after its claim arose:

"When a purchase money interest is claimed by a secured party who is not a seller, he must of course have given present consideration. This section therefore provides that the purchase money party must be one who gives value 'by making advances or incurring an obligation': *the quoted language excludes from the purchase money category any security interest taken as security for or in satisfaction of a preexisting claim or antecedent debt."* [Emphasis by the Court.] U.C.C. § 9–107, Comment 2.

In any case, the trial court made no such finding.[3]

█ There was also no finding by the trial court that Gamble-Skogmo had knowledge of the Bank's security interest and was thus required to give notification of its purchase money security interest. This is not, however, critical, as the general priority rules would still apply. See the following provisions of Section 41–09–33, N.D.C.C.

"5. In all cases not governed by other rules stated in this section *(including cases of purchase money security interests which do not qualify for the special priorities set forth in subsections 3 and 4 of this section),* priority between conflicting security interests in the same collateral shall be determined as follows:

a. in the order of fiing if both are perfected by filing, regardless of which security interest attached first under subsection 1 of section 41–09–17 and whether it attached before or after filing;

b. in the order of perfection unless both are perfected by filing, regardless of which security interest attached first under subsection 1 of section 41–09–17 and, in the case of a filed security interest, whether it attached before or after filing; and

c. in the order of attachment under subsection 1 of section 41–09–17 so long as neither is perfected." [Emphasis by the Court.] § 41–09–33(5), N.D.C.C. (U.C.C. § 9–312(5)).

Thus, even if Gamble-Skogmo failed to meet the test for special priority under subsection 3, it would still prevail under the first to file rule of subsection 5. *See* 1A Bender's Uniform Commercial Code Service § 19.04[3][a].

█ The Bank questions why Gamble-Skogmo would require subordination of the debt of other creditors when it already provided for its priority under the provisions of Article 9 of the U.C.C. The argument is that the two methods of assuring priority are somehow inconsistent with each other. We do not believe a secured creditor should lose its priority because of actions it took to further insure its priority, unless, under some legal theory, it can be shown that by its action it improperly led another creditor to lose its security.

---

**3.** For discussion of situations wherein two conflicting purchase money security interests in the same inventory collateral may arise, *see* 1A

Bender's Uniform Commercial Code Service Section 19.04(3)(b) (1976).

No such theory has been specifically argued in this case, although those that immediately come to mind include fraud, estoppel, and unconscionability. Fraud, which must be pleaded with particularity under Rule 9(b), N.D.R.Civ.P., was not pleaded by the Bank and is not indicated in any finding or conclusion of the trial court, nor does the record show any attempt by the Bank to prove fraudulent intent on the part of Gamble-Skogmo.

With regard to equitable estoppel, the basic elements of that concept were recently set out in *Farmers Cooperative Ass'n of Churchs Ferry v. Cole*, 239 N.W.2d 808 (N.D.1976):

"4. The basic elements of equitable estoppel that must be met as to the person being estopped are: (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct will be acted upon by, or will influence, the other party or persons; and (3) knowledge, actual or constructive, of the real facts. The elements that must be found as to the person claiming the estoppel are: (1) lack of knowledge and the means of knowledge of the truth as to the facts in question; (2) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (3) action or inaction based thereon, of such a character as to change the position or status of the party claiming the estoppel, to his injury, detriment, or prejudice." *Id.*, Syl. 4 at 809–810.

*Accord, Will v. Will,* 249 N.W.2d 227 (N.D. 1976); *Cranston v. Winters,* 238 N.W.2d 647 (N.D.1976); *Sorenson v. Olson,* 235 N.W.2d 892 (N.D.1975).

■ There was no specific finding of any of these elements. The loan of $15,000 by the Bank to Reiff on May 15, 1974, at Gamble-Skogmo's request, presents the most apparent case for applying the principles of equitable estoppel. We note, however, that one element that must be found as to the person claiming estoppel is that he have a "lack of knowledge *and the means of knowledge* of the truth as to the facts in question". As the Bank had the means of knowledge of the truth in this case, in that the unambiguous language of the rider was before its officer, Mr. Lerberg, to read and the records of the filings of financing statements are open to the public in the Secretary of State's office, equitable estoppel could not apply in this case.

■ The doctrine of unconscionability is set forth in Section 41–02–19, N.D.C.C. (U.C.C. § 2–302):

"1. If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may' refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause as to avoid any unconscionable result.

"2. When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination."

The test of unconscionability is whether or not, in the particular commercial setting, the terms of the agreement are so one-sided as to be unconscionable. U.C.C. § 2–302, Comment 1. Comment 1 goes on to say that the underlying principle of unconscionability is the prevention of "oppression and unfair surprise" rather than "disturbance of allocation of risks because of superior bargaining power". An issue arises as to whether or not this doctrine may be extended beyond Article 2 (Chapter 41–02, N.D.C.C.). If we were to do so by analogy, as there has been no hearing on the issue of unconscionability, we would be unable to consider it at this time, and by precedent would be required to remand the matter to the trial court. As it has not been raised as an issue, we do not believe it would be proper to remand for the determination of such an issue by the trial court in this case.

Section 41–02–19(2), N.D.C.C., *supra.* *Haugen v. Ford Motor Co.,* 219 N.W.2d 462 (N.D.1974).

■ It is important that the priority of secured parties be clear and certain, and not subject to uncertainty arising because of events arising after perfection, unless the creditors involved show a deliberate intention to so reorder their priorities. *See Borg-Warner Accept. Corp. v. First Nat. Bank,* Minn., 238 N.W.2d 612 (1976).

In *Borg-Warner,* the Supreme Court of Minnesota upheld the priority of filings, even though the court believed it would work a financial hardship on one of the creditors, a bank. *Id.* at 238 N.W.2d 615. The bank in that case, a purchase money secured party, lost its priority by failing to notify *Borg-Warner* of the purchase money security interest. Although, as we have pointed out earlier, the People's Bank and Trust of Parshall does not appear to be a purchase money secured party, it could have prevailed over Gamble-Skogmo (a purchase money secured party which failed to give notice pursuant to Section 41–09–33(3), N.D.C.C. (U.C.C. § 9–312(3))) had it not waited several months following the extension of credit to Reiff before perfecting its security interest by filing and had it not signed a subordination agreement.

The Bank argues, in its brief, that the conduct of Gamble-Skogmo "can hardly be said to constitute good faith. . . ." The Code imposes an obligation of good faith under Section 41–01–13, N.D.C.C. (U.C.C. § 1–203), and defines it as "honesty in fact in the conduct or transaction concerned." Section 41–01–11(19), N.D.C.C. (U.C.C. § 1–201(19)). There has been no allegation of a specific dishonest act by Gamble-Skogmo in the transactions shown on the record, nor, as previously said, has fraud been alleged, proved or found to exist. *See Adams v. Little Missouri Minerals Assn.,* 143 N.W.2d 659 (N.D.1966).

■ There might be situations where the paper work could become so voluminous that no businessman could be expected to read and comprehend all the "boilerplate" involved. In those situations, it might be possible that agreements made by the parties would not be properly reflected in the writing. It has not been alleged in this case that a scrivener's error (a mistake in reducing the agreement to writing) exists. We cannot now treat that issue, as mistake, an averment which must be pleaded with particularity, is not raised in the pleadings. Rule 9(b), N.D.R.Civ.P.; *Gajewski v. Bratcher,* 221 N.W.2d 614 (N.D.1974).

The financing statement filed by Gamble-Skogmo on July 20, 1972, described as security: "all inventory of goods and merchandise now in the possession, or hereafter acquired by the debtor which is held for sale or lease in connection with the debtor's business." A box was checked on the form indicating that the proceeds of the collateral were also to be covered. The trial court, in finding of fact No. XIV, found that Gamble-Skogmo liquidated assets of Gamble's No. 4698, including "goods on hand, inventory, accounts receivable, furniture and fixtures . . . .." Although this issue was not raised by the parties, this finding indicates that Gamble-Skogmo liquidated items (furniture and fixtures) which are not within the scope of its financing statement. There is, however, no indication on the record that furniture and fixtures were liquidated. We believe this issue should be considered by the trial court in a redetermination of the priorities of the parties.

The trial court concluded that the parties intended to limit the priority of Gamble-Skogmo to $15,000. The rider dated December 11, 1973, in essence produced such result, but it also provided that the priorities are to be determined in accordance with Article 9 of the Uniform Commercial Code. The trial court erred by not following the provisions of Article 9 of the U.C.C. as to the priorities.

Whether the payment of the $15,000 on May 15, 1974, by the Bank to Reiff at Gamble-Skogmo's request, establishes a priority on the part of the Bank on any other equitable basis not discussed herein, we do not decide today, but because of the complexities of the case and the possibility of the application of law and equity not dis-

cussed herein nor urged upon the court, we remand the case to the trial court with authority to consider same and receive additional testimony if necessary.

For the reasons stated, the judgment appealed from is reversed and the case remanded for a redetermination of the priorities of the creditors in a manner not inconsistent with this opinion.

SAND and PAULSON, JJ., concur.

PEDERSON, Justice (concurring specially).

Although I agree with the legal principles stated in the majority opinion and I agree that there must be a reversal and remand, I prefer to base the decision on Rule 52(a), NDRCivP.

*Warner v. Johnson,* 213 N.W.2d 895, 897 (N.D.1973), quoting from 9 Wright & Miller, Federal Practice and Procedure: Civil, § 2571, pages 679, 680, stated in part that: " . . . the requirements that findings of fact be made is intended to evoke care on the part of the trial judge in ascertaining the facts."

The rule requires that the trial court find the facts *specially* and state *separately* its conclusions of law thereon, which form the basis for the decision. The findings should be adequate to permit the appellate court to clearly understand the basis for the decision. *Ellendale Farmers Union Cooperative Ass'n v. Davis,* 219 N.W.2d 829 (N.D.1974).

When a conclusion of law is not supported by a finding of fact, I believe that the findings are clearly erroneous. We have repeatedly said that we will look to a memorandum opinion to assist us in reaching a clear understanding of the basis for the decision. In this case there is no memorandum opinion and, in my opinion, the decision is not supported by a proper conclusion of law nor the necessary finding of fact. The findings which were made may very well be supported by substantial evidence, but that is not the end of the Rule 52(a) test. The opportunity is available under Rule 52(b) to move to amend findings.

In this case we have an agreement that clearly requires that Article 9 of the Uniform Commercial Code be applied. There is no finding of fact nor conclusion of law which informs me clearly why it was not applied in the decision or, if it was applied, how. The majority indicates that there are several possible reasons (but which were not raised), one of which is "unconscionability." Courts are not generally receptive to pleas of unconscionability raised by nonconsumers. *Ray Farmers Union Elevator Co. v. Weyrauch,* 238 N.W.2d 47, 50 (N.D.1976).

VOGEL, Justice, dissenting.

I dissent, for the reason that the Uniform Commercial Code, in my opinion, governs this case entirely rather than partially.

In my view, the majority opinion errs in deciding that the non-U.C.C. parol-evidence rule applies and in deciding that the subordination agreement is not governed by the U.C.C.

The subordination agreement is not a document to be construed by itself, but is a part of a long series of transactions affecting Gamble-Skogmo, Reiff, and Peoples Bank & Trust. This series of transactions involved sales of inventory and went on for some years. All of it is governed by the U.C.C., not just part of it. Section 41–01–02, N.D.C.C. [§ 1–102, U.C.C.], states that the Code is to be liberally construed and applied to promote its underlying purposes and policies, and that one of its underlying purposes and policies is to simplify, clarify, and modernize the law governing commercial transactions. Subdivision 3 of the same statute provides that the effect of provisions of the Code may be varied by agreement. The Code itself specifically recognizes subordination agreements in Section 41–09–37, N.D.C.C. [§ 9–316, U.C.C.]. Courts have recognized that subordination agreements are governed by the Uniform Commercial Code. *Williams v. First National Bank & Trust Co. of Vinita,* 482 P.2d 595 (Okl.1971); *Vahlsing Christina Corporation, Inc. v. First National Bank of Hobbs,* 491 S.W.2d 954 (Tex.Civ.App.1973).

The majority opinion itself cites cases extending the principles of the Uniform Commercial Code by analogy. It cites no cases to the effect that a subordination agreement is not governed by the Uniform Commercial Code. It relies on Section 41–01–03, N.D.C.C. [§ 1–103, U.C.C.], but that statute by its terms applies only where the Uniform Commercial Code does not displace prior law. Here, prior law is displaced by the Uniform Commercial Code provisions allowing subordination agreements, Section 41–09–37, N.D.C.C. [§ 9–316, U.C.C.], and providing a new parol-evidence rule, Section 41–02–09, N.D.C.C. [§ 2–202, U.C.C.]. I would hold that the subordination agreement is governed by the Uniform Commercial Code.

If the Uniform Commercial Code governs the subordination agreement here, then there is no reason for not applying the Uniform Commercial Code parol-evidence rule, Section 41–02–09, N.D.C.C. [§ 2–202, U.C.C.].[1] That rule does not refer to sales, and Section 41–02–02, N.D.C.C. [§ 2–102, U.C.C.], refers to "transactions in goods," a broader term than "sales." Chapter 41–02, N.D.C.C. [Article 2, U.C.C.], may be applied to transactions which are analogous to sales although not technically sales. *Hunt Foods and Industries, Inc. v. Doliner,* 26 A.D.2d 41, 270 N.Y.S.2d 937 (1966).

Once that rule is applied, rather than the older North Dakota general parol-evidence rule found in Section 9–06–07, N.D.C.C., much of the majority opinion becomes inapplicable and the result must be just the opposite. We should affirm the district court.

The difference between the two parol-evidence rules is striking.[2] Section 9–06–07, N.D.C.C., says flatly that the execution of a contract in writing supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument. Section 41–02–09, N.D.C.C. [§ 2–202, U.C.C.], contains similar language but is applicable only when the writing is intended to be a final expression of the agreement, and goes on to say that the writing may be explained or supplemented by course of dealing or usage of trade or by course of performance, and by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

The lower court obviously held, and I think properly, that the Uniform Commercial Code parol-evidence rule applied. It therefore received in evidence the letter quoted in the majority opinion which the majority opinion holds was improperly admitted, and the court considered evidence of Reiff, Lerberg, and Isaak (an employee of Gamble-Skogmo) which clearly indicated that all parties considered that the subordination agreement applied only to the extent of a $15,000 priority to Gamble-Skogmo, and gave priority to the Bank's claim thereafter.

Since the Uniform Commercial Code rule applies, cases construing the North Dakota parol-evidence rule, such as those cited in the majority opinion, do not apply.

I agree that the trial court's conclusion of law No. 2 is a finding of fact. I cannot agree that this finding of fact is clearly erroneous, or erroneous at all. On the contrary, there is evidence, as I said, that all parties understood that Gamble-Skogmo's priority extended to only $15,000. The trial court no doubt also was influenced, as well as it might be, by the letter quoted in the majority opinion and by the fact that the Bank's additional $15,000 loan after Reiff was in serious financial difficulty would have made no sense at all unless the Bank had reason to believe that it was protected

---

1. For a case where we recently applied the U.C.C. parol-evidence rule and allowed parol evidence to explain a written memorandum where there was no finding that the writing was intended to be a complete and exclusive statement of the terms of the agreement, see *Merwin v. Ziebarth,* 252 N.W.2d 193, 197–198 (N.D.1977).

2. See White & Summers U.C.C. HB §§ 2–9 to 2–12 for discussion of differences between § 2–202 and traditional parol-evidence rules.

348

by the subordination agreement. It also is worth noting that the Bank was requested by Gamble-Skogmo to make the additional loan.

Since I believe that this is a case which is governed entirely by the Uniform Commercial Code, that the Uniform Commercial Code parol-evidence rule applies to the subordination agreement and rider, and that the trial court applied the parol-evidence rule properly and found as a fact that Gamble-Skogmo's priority was to the extent of only $15,000, I would affirm the trial court's judgment.