**FLEXI–VAN LEASING, INC., Plaintiff,**

v.

**PHAROS LINES, S.A. and Constellation Navigation, Inc., Defendants.**

**Nos. 89 Civ. 7888 (CBM),
90 Civ. 5222 (CBM).**

United States District Court,
S.D. New York.

June 17, 1992.

---

See also 808 F.Supp. 255.

Flicker & Associates by Keith L. Flicker, Richard L. Garelick, New York City, for Flexi–Van Leasing, Inc.

**240**

Philip V. Moyles by Philip V. Moyles, New York City, for Pharos Lines, S.A. and Constellation Navigation, Inc.

OPINION

MOTLEY, District Judge.

FINDINGS OF FACT AND
CONCLUSIONS OF
LAW

I. *Introduction*

This action was commenced on November 28, 1989 when plaintiff Flexi-Van Leasing, Inc. ("Flexi-Van") filed suit against defendant Pharos Lines, S.A. ("Pharos Lines"). Flexi-Van claimed breach of contract and conversion regarding marine equipment it had leased to Pharos Lines.

On August 10, 1990, Flexi-Van filed a separate action against defendant Constellation Navigation, Inc. ("Constellation Navigation"). Flexi-Van alleged that Constellation Navigation, as Pharos Lines' agent, had exercised dominion and control over the marine equipment Flexi-Van had leased to Pharos Lines. Flexi-Van claimed that Constellation Navigation, therefore, owed Flexi-Van a duty to use reasonable care in the management, dominion and control of the equipment. The duty was allegedly breached by Constellation Navigation's negligence.

On October 19, 1990, by stipulation and order, the two suits were consolidated. On January 8, 1992, Judge Sand transferred the consolidated action to Judge Motley, who held a bench trial on January 13–15, 27–29, 1992.

The court notes that Pharos Lines has withdrawn three of its four counterclaims. The only remaining counterclaim is Pharos Lines' claim for expenses and charges allegedly incurred by Pharos Lines in returning Flexi-Van containers from Romania and Turkey which had been under lease to Prudential Lines, Inc.

II. *Findings of Fact*

After hearing the evidence and weighing the testimony and exhibits received in evidence, as well as the credibility of the witnesses, the court makes the following findings of fact:

1. Flexi-Van is a Delaware corporation with its principal place of business at One University Plaza, Hackensack, N.J. 07601. (Complaint at 1).

2. Pharos Lines is a Panamanian corporation and did business within the United States through its general agent Constellation Navigation. (Ex. FF).

3. Constellation Navigation is a New York corporation with its principal place of business at 80 Broad Street, New York, N.Y. 10004. Previously, Constellation Navigation was located at 233 Broadway, 6th Floor, New York, N.Y. 10007. (Tr. 625/12–18; Complaint at 2; Ex. FF).

4. At all times as to the matters alleged in the Complaint, Constellation Navigation acted as the general agent in the United States for Pharos Lines. (Pre-trial Order at 2, ¶ 3(a)(2) (stipulated fact)).

A. The Lease Agreement

5. Pursuant to a written agreement dated October 22, 1985 and addenda thereto (the "Lease Agreement"), Pharos Lines and Flexi-Van entered into a marine equipment Lease Agreement. (Ex. 1; Pre-trial Order at 2, ¶ 3(a)(1) (stipulated fact)).

6. Under the Lease Agreement, Flexi-Van leased to Pharos Lines almost seven hundred units of equipment, consisting of chassis, marine containers and flatbed trailers. (Ex. 1; Tr. 62/22–63/4). Among other things, the Terms and Conditions of the Lease Agreement provide that the lessee shall have the duty to maintain the equipment in good repair, with the lessee being responsible for the costs of such repairs (¶ 2); that the lessee shall be responsible for the payment of casualty values relative to any unit that is lost, missing or otherwise not returned to Flexi-Van (¶ 3); that the lessee shall be charged at an interest rate of 15% per annum for any outstanding charges that are not timely paid (¶ 6); and that the lessee shall be responsible for attorney's fees incurred by Flexi-Van in connection with Flexi-Van's efforts to recover

outstanding charges or unreturned equipment (¶ 9).

7. By its terms, the Lease Agreement was to run for five years, from September 1, 1985 to August 31, 1990. (Ex. 1).

8. At the time when Flexi–Van and Pharos Lines entered into the Lease Agreement, the units of equipment leased thereunder were then on lease to nonparty Constellation Lines, S.A. ("Constellation Lines").[1] (*See* Ex. PP, PP–1, PP–2, PP–3, PP–4, QQ). Elias J. Kulukundis, a director of Pharos Lines (Ex. 13 at 14/17–23), testified that Pharos Lines was incorporated in 1985 for the business purpose of continuing a liner service from the eastern seaboard ports in the United States to the eastern Mediterranean that had previously been under the control of Constellation Lines, which ceased to provide that liner service in 1985. (Ex. 13 at 16/9–22/11).

9. The continuity running from the operations of Constellation Lines to Pharos Lines is further manifested by the fact that Pharos Lines' general agent, Constellation Navigation, also served as the general agent for Constellation Lines. (Tr. 730/10–11).

10. The Lease Agreement explicitly states that "Lessee will, at its expense, pick up the units [of leased equipment] from Lessor at: As is, where is." (Ex. 1). Thus, the lease provided that it would be incumbent upon Pharos Lines to take possession of the equipment from wherever Constellation Lines, the previous lessee, had last placed the equipment. Such an arrangement made sense since Pharos Lines was then assuming and continuing Constellation Lines' liner service. Presumably, the equipment would be in locations conducive to the operation of that same liner service.

**B.  Payment Problems**

11. Throughout the duration of the parties' relationship, there was no dispute regarding the amount Pharos Lines owed Flexi–Van under the lease. As both parties indicated, every time Pharos Lines made a lease payment, it was made in the full amount due for the respective billing period. (Tr. 73/23–76/6; 464/14–465–5; 608/23–610/22).

12. However, Pharos Lines was consistently late in making payments, or otherwise completely missed making payments under the Lease Agreement. (Tr. 60/14–62/21). On account of Pharos Lines having been in arrears (and, therefore, in default) under the Lease Agreement, on March 24, 1987 Flexi–Van exercised its rights to terminate the Lease Agreement with Pharos Lines. (*See* Ex. 2, ¶ 7). Flexi–Van, however, allowed Pharos Lines to cure this default. On April 28, 1987, Flexi–Van and Pharos Lines entered into a Settlement Agreement which incorporated a paydown schedule with respect to the arrearage and which also provided that Pharos Lines must pay all future outstanding invoices within 20 days of the invoice date on an ongoing basis. (Ex. 2; Tr. 73/9–13).

13. Notwithstanding the promises made by Pharos Lines under the Settlement Agreement, Pharos Lines persistently failed to make timely payments to Flexi–Van under the Lease Agreement and the Settlement Agreement. (Tr. 432/25–437/15; 454/3–16).

14. Pharos Lines ultimately went into default under the Lease Agreement on account of its failure to make timely lease payments to Flexi–Van. On November 22, 1989, Flexi–Van exercised its right to terminate the Lease Agreement on account of the Pharos Lines' default. (Tr. 78/12–79/3; Ex. 3).

**1.** This factual finding is arrived at as follows: ¶ 1 of Appendix B to the Lease Agreement (Ex. 1) identifies the equipment leased to Pharos Lines as "presently on" various Flexi–Van accounts, namely account numbers CO155, CO215, TO04248, TO04662, CO428, CK281, CU042, CZ005 and TO04941. Exhibit KK—which is a Flexi–Van computer printout that provides a leasing history of each unit of equipment that was leased to Pharos Lines under the Lease Agreement—shows that the units of equipment that were leased to Pharos Lines (which units are identified in Appendix A to the Lease Agreement) were all on lease to Constellation Lines under these various Flexi–Van customer accounts up until the effective date of the Lease Agreement (September 1, 1985).

15. Pharos Lines claims that on November 28, 1989 Flexi–Van accepted $17,536.82, covering the lease payment due for rental charges for the month of November. (Tr. 455/17–456/4). Pharos Lines also asserts that it made monthly rental payments of $17,536.82 in December 1989, January 1990 and February 1990. (Tr. 456/11–16; Ex. Z, AA). Pharos Lines ceased making payments in March 1990 since it claimed that its counterclaims exceeded the balance to be paid under the Lease Agreement.[2]

16. Since Pharos Lines' counterclaims in no way exceeded the balance to be paid under the Lease Agreement (see infra), the court would reach the same conclusion—that Pharos Lines defaulted on the Lease Agreement—whether or not the court found that Flexi–Van accepted Pharos Lines' payments in November 1989, December 1989, January 1990 and February 1990. For the sake of clarity, the court finds that Pharos Lines defaulted on March 20, 1990 when it failed to make its lease payment for the month of March 1990. This ruling is in keeping with the fact that Flexi–Van seeks damages only from March 1990 forward. (Tr. 445/8–21).

17. The Lease Agreement provides that upon the default of Pharos Lines, Flexi–Van is entitled to accelerate and immediately recover from Pharos Lines rental fees that are to become due during the remainder of the term of the Lease Agreement. (Ex. 1, Terms and Conditions ¶ 9). At the time that Flexi–Van terminated the Lease Agreement, it demanded that Pharos Lines immediately pay those accelerated rental fees. Also, in accord with its rights under the Lease Agreement, Flexi–Van demanded the immediate return of the leased equipment. (Pre-trial Order at 2, ¶ 3(a)(5) (stipulated fact)). However, neither Pharos Lines nor its general agent Constellation Navigation—who maintained exclusive and complete dominion and control over the leased equipment—returned the equipment to Flexi–Van; rather, Pharos Lines and Constellation Navigation converted the

equipment for their own benefit. (See infra ).

C. The Agency Relationship Between Pharos Lines and Constellation Navigation

18. As noted in ¶ 4, supra, at all times relevant to this action Constellation Navigation acted as the general agent in the United States for Pharos Lines. (Pre-trial Order at 2, ¶ 3(a)(2) (stipulated fact)).

19. Prior to the parties' execution of the Lease Agreement, Pharos Lines and Constellation Navigation had already forged a broad principal-agent relationship. Pharos Lines had delegated to Constellation Navigation exclusive and complete authority and responsibility to manage and operate Pharos Lines' ocean liner service. This delegation included, without limitation, the authority and responsibility to: (1) negotiate and coordinate the booking, loading and discharge of cargo; (2) negotiate and coordinate services provided by stevedores and other suppliers of services and goods incidental to the ocean liner service; (3) collect freight from shippers, pay bills and perform accounting services; and, most importantly here, (4) coordinate and monitor intermodal operations including the use, maintenance and payment for the use of leased intermodal equipment such as that leased from Flexi–Van to Pharos Lines under the Lease Agreement. (Ex. 13 at 44/12–45/18; 46/2–10; 48/23–50/8; 50/19–52/7; Tr. at 566/9–17; 584/2–585/5).

20. Constellation Navigation maintained a Container Manager, Kamal Nayan Shah, who was in charge of intermodal operations. His duties were, among other things, to coordinate the use of marine equipment by Constellation Navigation's principals, which included Pharos Lines. (Tr. 565/6–14; Pre-trial Order at 2, ¶ 3(a)(3) (stipulated fact)).

21. At all times during the Lease Agreement between Flexi–Van and Pharos Lines, Constellation Navigation exercised exclusive and complete dominion and control over the marine equipment that was leased under the Lease Agreement. As

---

**2.** At this time, such claim is disingenuous since Pharos Lines owed $105,220.92 under the lease

($17,536.82 per month for March–August 1990) and claims only $47,522.50 in its counterclaim.

Pharos Lines' Mr. Kulukundis testified, Pharos Lines delegated to Constellation Navigation exclusive authority and responsibility to manage and keep track of the whereabouts of the leased equipment. (Ex. 13 at 46/2–10). Furthermore, Flexi–Van's General Counsel, Bernard Vaughan, testified that all of Flexi–Van's dealings relating to the equipment leased to Pharos Lines under the Lease Agreement with respect to "payment and recovery of equipment was always with Constellation [Navigation] personnel." (Tr. 120/15–22). Constellation Navigation was responsible for monitoring and coordinating the movement of the leased equipment as the equipment was used in Pharos Lines' ocean liner service. (Tr. 577/17–578/25; 584/12–15). In connection with these responsibilities relative to the tracking of the leased equipment, Constellation Navigation was responsible for regularly communicating with the various equipment depots through which the leased equipment passed so as to ensure that the location of the equipment was properly monitored. (Tr. 579/1–586/15).

D.  Defendants' Alleged Breach

22.  Notwithstanding these duties, Constellation Navigation personnel failed to keep track of the whereabouts of Flexi–Van's equipment which was the subject of the Lease Agreement. Pharos Lines' Mr. Kulukundis testified as to Constellation Navigation's poor performance in this regard.

Q.  [by Mr. Flicker] Do you know what type of tracking system [Constellation] Navigation did use?

A.  [by Mr. Kulukundis] No system.

Q.  Were they supposed to have a system?

A.  They were supposed to.

Q.  What was the system supposed to have done?

A.  Supposed to trace and report to me how many containers and where they were and conditions they were, but I never got this, chassis and flatbeds. I apologize, I don't know this business, but all equipment including some forklifts. They were leased but also owned some of them. They're supposed to know where every bloody piece of equipment was.

Q.  That was Pharos' expectation of Navigation, that they would be able to advise Pharos as to the location of each unit at any time?

A.  They had—actually Pharos was me at the time.

Q.  They were supposed to advise you?

A.  Yes.

Q.  It's your statement that they did not or were not able to provide you with that information?

A.  They never provided me with complete and true—I don't mean lie, but complete.

Q.  Accurate?

A.  Accurate.

Q.  Did you ever—who was the individual at Navigation who was responsible for this?

A.  Everybody was responsible but including Mr. Casino, Christophides.

Q.  Mr. Shah?

A.  Shah came after my time. It was Mike Boyle mainly and then Casino and Kevin Shield for some time.

Q.  Were you supposed to get reports on—at certain time intervals as to where the equipment was located?

A.  Yes. I supposed to get how many units we had.

Q.  How often were you supposed to get this information?

A.  Actually I should get it any time I ask for it, and every two, three months after the completion of a voyage, because was really locating the containers of voyage.

Q.  Did you get this information provided to you?

A.  No.

Q.  Did you get it on two- or three-month intervals?

A.  I got it a few times during the period of my tenure.

Q.  Did you get it when you asked for it?

A.  I was given some figures but they were never accurate.

**244**

(Ex. 13 at 46/11–48/22). Furthermore, Constellation Navigation's former Container Manager, Mr. Shah, acknowledged that Constellation Navigation had no idea where certain Flexi–Van units that were on lease to Pharos Lines were located.

Q. [by Mr. Flicker] Now, in this system you've testified that there were a bunch of units in different locations that were being retained by third parties, and were there other units that were just missing?

A. [by Mr. Shah] There were quite a few units which we could not find their movements after I had joined the company.

Q. Of course, I'm talking about the Flexi–Van?

A. Yes.

Q. Now, of those units there was no idea as to where they were; is that accurate?

A. Yes.

(Tr. 616/10–20; see Ex. Y).

23. Pharos Lines continues to have in its possession certain equipment leased under the Lease Agreement. (Pre-trial Order at 2, ¶ 3(a)(6) (stipulated fact)). Constellation Navigation exercised exclusive and complete dominion and control over equipment that has not been returned to Flexi–Van.

24. Particularly, Pharos Lines and Constellation Navigation have failed to return to Flexi–Van 89 units of equipment that were leased under the Lease Agreement. (Ex. 4; Tr. 118/21–23; 443/11–444/23). Constellation Navigation's former Container Manager, Mr. Shah, acknowledged that Flexi–Van units are missing and are, therefore, incapable of being returned to Flexi–Van. (Tr. 619/3–20).

25. Constellation Navigation, as the entity that exercised complete dominion and control over the leased equipment, unconditionally refused and wholly failed to cooperate with Flexi–Van's request that Constellation Navigation assist Flexi–Van in locating and recovering the unreturned equipment. The uncontroverted testimony of Randy Snoke, Flexi–Van's Director of Credit, was that in the latter part of November 1989 and in December 1989 he wrote to Mr. Shah four or five times demanding information as to the leased equipment's location, but Mr. Shah never responded to these demands. (See, e.g., Ex. Y; Tr. 440/1–16). Furthermore, Flexi–Van's General Counsel, Mr. Vaughan, testified as to Constellation Navigation's outright refusal to cooperate with Flexi–Van's recovery efforts.

Q. [by Mr. Flicker] Did Constellation [Navigation] tell you they had the ability to identify where our equipment was?

A. [by Mr. Vaughan] Yes.

Q. Who told you that?

A. Shah.

Q. And when did he tell you that?

A. In these discussions when we were asking for the equipment back. He's the one who had control over the, the operational control.

Q. Just answer the question please.

A. Yes.

Q. Did he ever give you that information?

A. No.

Q. Did he ever refuse to give it to you?

A. Yes.

Q. When did he ever refuse to give it to you?

A. They said at one point that if we would not sue them, they would cooperate with the recovery of the equipment.

Q. After that point in time, did he ever talk to you again about helping you get your equipment by giving you that list?

A. No, they had abandoned recovery efforts.

(Tr. 95/11–96/8).

26. In addition to Constellation Navigation's unwillingness to provide Flexi–Van with the locations of the leased equipment, Constellation Navigation was equally unable to provide the demanded information. (Tr. 437/16–439/12). Both Mr. Shah and Constellation Navigation's Executive Vice President, David Alouf, acknowledged that units were just plain missing and incapable of being located. (Tr. 616/10–20; 618/11–619/2; 655/8–656/22).

E. Flexi–Van's Recovery Efforts

27. On account of Constellation Navigation's unwillingness and inability to cooperate with Flexi–Van's efforts to locate and recover the equipment which had been within Pharos Lines and Constellation Navigation's possession, dominion and control when Flexi–Van terminated the Lease Agreement, Flexi–Van was compelled to engage in equipment recovery efforts on its own. The testimony of Mr. Vaughan and the testimony of Tommy Long, Flexi–Van's regional manager for the South Atlantic region, is replete with examples of Flexi–Van's efforts to locate and recover its equipment that had been on lease to Pharos Lines. (Tr. 103/14–118/20; 207/15–255/3).

1. *Four Flatbeds at Trident Shipping*

28. In January 1991, Flexi–Van's Mr. Long located and identified as Flexi–Van equipment four flatbed trailers ("flatbeds") that were then on the Charleston, South Carolina premises of Trident Shipping Agency, Inc. ("Trident Shipping"). (Tr. 250/7–251–2). Constellation Navigation has a 50% ownership interest in Trident Shipping. The other 50% is owned by Orestes G. Christophides. (Tr. 720/8–17). Mr. Christophides also has a one-third of 49% ownership interest in Constellation Navigation. (Tr. 718/17–21).

29. Mr. Long located the flatbeds through the assistance of Anthony Rhodes, the operator of a Flexi–Van depot in Charleston who had previously assisted Flexi–Van in equipment recovery efforts. (Tr. 286/18–287/3; 271/23–273/7; 283/14–284/5). Mr. Rhodes and Mr. Long were able to identify these units as Flexi–Van equipment by the "GIL" prefix stenciled on the units. (Tr. 288/4–12; 285/12–16). Mr. Long then contacted Karen Godfrey, a Trident Shipping employee, and advised her that the four flatbeds belonged to Flexi–Van. Ms. Godfrey responded that she could not release the equipment to Flexi–Van without Constellation Navigation's authorization. Shortly thereafter, Ms. Godfrey told Mr. Long that she had spoken with Constellation Navigation and that Trident Shipping was not given authorization to release the equipment to Flexi–Van. (Tr. 251/10–252/8). Subsequently, Flexi–Van's Operations and Recovery Director, Mr. Cassidy, wrote to Constellation Navigation demanding the immediate release of the four flatbeds. (Ex. 8). Constellation Navigation, however, refused. (Tr. 112/23–115/2).

30. Constellation Navigation's Mr. Shah testified that the Trident Shipping facility in Charleston was considered to be and operated as Constellation Navigation's "own office" and "own facility" and "storage yard." (Tr. 602/5–18). In addition, Mr. Shah acknowledged that it was within Constellation Navigation's control to release any equipment that was being held in the Trident Shipping facility. He also acknowledged that Constellation Navigation was aware that there was Flexi–Van equipment in its possession at the Trident Shipping facility (as well as another South Carolina facility that was operated by Constellation Navigation). (Tr. 602/5–603/16). Nevertheless, Constellation Navigation never released the four flatbeds to Flexi–Van.

31. The four flatbeds, however, ultimately resurfaced. On the afternoon of Friday January 10, 1992—three days before the start of the trial of this action—Mr. Rhodes was visiting the premises of the South Carolina Port Authority in Charleston where he came upon Mike Siliris and Orestes G. Christophides, neither of whom Mr. Rhodes knew at the time. (Tr. 303/15–22). Mr. Siliris is the Port Captain of Constellation Navigation in the Port of Charleston. He is also a vice-president of Trident Shipping. (Ex. 17).

32. Mr. Siliris introduced Mr. Christophides to Mr. Rhodes. Mr. Christophides then handed Mr. Rhodes a business card that identified Mr. Christophides as a Director of Constellation Navigation; at the same time Mr. Christophides stated to Mr. Rhodes that Mr. Christophides was "the owner." (Tr. 303/23–304/14; Ex. 17). Thus, Mr. Christophides held himself out as a representative of Constellation Navigation to Mr. Rhodes.

33. As stated in ¶ 28, *supra,* Mr. Christophides testified that he is a Director of Constellation Navigation, that he owns one-third of 49% of Constellation Navigation, and that he owns 50% of Trident Shipping, with the other 50% being owned by Constellation Navigation. (Tr. 692/6–8; 718/17–21; 720/8–17). Mr. Christophides also testified that he is the President of NCI Equipment Co., Inc. ("NCI"). (Tr. 692/9–20).

34. Mr. Christophides's testimony and his demeanor at trial suggest that he is a sophisticated businessman with considerable experience in the area of transactions involving marine equipment. This is reflected in the size of the deals in which Mr. Christophides was previously involved. For instance, Mr. Christophides testified that through his companies he took out a $1,000,000.00 bank loan to finance the purchase of a fleet of marine equipment. (Tr. 694/14–695/7). He also testified that he personally guaranteed this loan. (Tr. 722/2–19).

35. Mr. Rhodes told Mr. Siliris that he was interested in purchasing various equipment that was then located on the premises of Trident Shipping. This equipment included the four flatbeds that Mr. Rhodes had identified in January 1991 as Flexi-Van equipment. Mr. Siliris indicated that Mr. Rhodes should return to the Port over the weekend to give he and Mr. Christophides an opportunity to discuss the matter. (Tr. 304/15–307/14).

36. In dealing with Mr. Christophides, Mr. Rhodes testified that he understood he was dealing with all of the companies with which Mr. Christophides held himself out as a representative. When asked who they were, Mr. Rhodes testified "Trident, Constellation, the whole ball of wax." (Tr. 310/14–311/1).

37. Prior to the weekend meeting, Mr. Rhodes contacted Flexi-Van's General Counsel, Mr. Vaughan, in order to ensure that the flatbeds which Mr. Rhodes had previously identified as Flexi-Van units were still in fact owned by Flexi-Van. Mr. Vaughan confirmed that Flexi-Van owned the flatbeds and instructed Mr. Rhodes to move forward in his attempt to purchase the four units. (Tr. 307/19–309/4). Proof of Flexi-Van's ownership of the four flatbeds is established by Exhibit 20, which consists of the titles to the four flatbeds, as well as the corroborating testimonial and documentary evidence cited in ¶¶ 28–30, *supra,* and ¶¶ 38, 40–46, *infra.*

38. Since Mr. Christophides was not available over the weekend, Mr. Rhodes went to Trident Shipping's facility on Monday, January 13, 1992—the first day of the trial of this action—to meet with Mr. Siliris and Mr. Christophides. When Mr. Rhodes appeared that morning, he was told by Mr. Siliris that Mr. Christophides had not yet arrived and that it was Mr. Christophides who had authority to negotiate the sale. (Tr. 309/8–311/1). After Mr. Christophides arrived that morning, he and Mr. Rhodes began negotiations with respect to the various equipment that was located on Trident Shipping's facility. At times during the morning, Mr. Rhodes and Mr. Christophides viewed the equipment, including the four Flexi-Van flatbeds, which were clearly marked as such. (Tr. 331/14–332/11).

39. Mr. Christophides and Mr. Rhodes ultimately agreed to a price of $15,000.00 for certain specified equipment. (Tr. 311/2–315/13). Mr. Rhodes handed Mr. Christophides a check in the amount of $15,000.00 made payable to "NCI Equipment, Inc." (Tr. 334/7–335/7; Ex. 19). Mr. Christophides in turn handed Mr. Rhodes an itemized bill of sale that listed the equipment that was part of the deal, which included the four Flexi-Van flatbeds. (Tr. 335/24–336/1; Ex. 18).

40. During the transaction, Mr. Rhodes requested that Mr. Christophides give him titles to the equipment. The only title that Mr. Christophides turned over was one to a 1970 Chevrolet gas truck. (Tr. 316/22–318/5). When Mr. Rhodes asked if there were any liens or encumbrances on the four flatbeds, Mr. Christophides responded that he had lease purchased the units from Flexi-Van. (Tr. 318/6–319/20). Mr. Christophides, however, did not give Mr. Rhodes any documentation in support of his claim that he had lease purchased the flatbeds

from Flexi–Van, nor did Mr. Christophides provide Mr. Rhodes with titles to the flatbeds. (Tr. 322/1–323/25).

41. Mr. Christophides testified that in 1985 his company NCI had obtained from PK Finans International Corporation ("PK Finans") a $1,000,000.00 loan to purchase marine equipment that was then owned by Constellation Lines. (Tr. 694/14–695/7). This loan was collateralized by the purchased equipment. (Ex. OO). Through this testimony, Mr. Christophides seems to suggest that he believed that the four Flexi–Van flatbeds were part of this 1985 transaction where NCI purchased equipment from Constellation Lines. However, defendants cannot substantiate this suggestion. The PK Finans loan commitment letter states on its face that the collateralized equipment is "more fully described on attached Schedule A." (Exhibit OO). However, Mr. Christophides testified that he was unable to locate Schedule A. (Tr. 695/8–13).

42. Mr. Christophides also testified that NCI intended to lease back to Constellation Lines the equipment that NCI purchased from Constellation Lines, but that Constellation Lines went out of business about two or three months after the loan was made. (Tr. 696/7–14). However, defendants could not verify this story with either a purchase agreement or a lease agreement between NCI and Constellation Lines. (Tr. 730/3–24; 732/13–23; 733/17–21).

43. Mr. Christophides also testified that he believed that the four Flexi–Van flatbeds were his to sell because he understood them to be the subject of a lease purchase agreement between Constellation Lines and Flexi–Van. (Tr. 706/23–707/14; 714/9–19; 725/25–726/23; 728/12–729/14). However, defendants failed to produce any documentary evidence to support this lease purchase agreement. (Tr. 726/10–728/14).

44. Mr. Christophides attempted to explain why he did not consider it odd for him not to have titles to the Flexi–Van flatbeds, units which he believed were owned by his company. Mr. Christophides insisted that title to equipment that NCI purchased from Constellation Lines was vested in PK Finans:

Q. [by Mr. Flicker] Had you defaulted [Constellation Lines] on your lease agreement and taken the equipment back?
A. [by Mr. Christophides] The bank, I never took the equipment back, the equipment was titled in the name of PK Finans.
Q. The equipment was titled?
A. That's right. They took the full title. They owned it.
Q. That's not what it says here, does it? I'm asking you is that what is reflected by Exhibit OO?
A. Regardless of what Exhibit OO says PK Finans owns the equipment.
Q. Why do they own the equipment?
A. That was part of the deal, part of the, even though it's not here they insisted on owning it.
Q. So you say PK Finans insisted on owning the equipment?
A. Correct.

(Tr. 741/6–22). Mr. Christophides further insisted that after he had paid off the bank loan PK Finans still retained title to the collateralized equipment:

Q. [by Mr. Flicker] After the bank seized the equipment that's when you negotiated the stretch out of the payments [under the loan]?
A. [by Mr. Christophides] Pardon me?
Q. Is that when you negotiated a stretch out of the payments?
A. Yes, after I made the payment, yes.
Q. And did you then get title back?
A. No.
Q. They kept the title?
A. Absolutely. I mean the title was, they took the title when the loan went through and they, and when the loan was fully paid up they should have given me the title back. We still don't have them back.

(Tr. 744/14–745/1). Even Mr. Christophides acknowledged that such an arrangement was unusual:

Q. [by Mr. Flicker] That's unusual. Tell me, you've done a lot of financing

before, haven't you? How many have you done before?

A. [by Mr. Christophides] Not many.

Q. Not many?

A. No.

Q. Have you ever seen a deal like this?

A. No.

Q. I mean is it highly unusual for the bank to take title to the equipment?

A. It is, I thought is to too, and I didn't want to do it but CLSA was so desperate for the money that I agreed to it.

Q. And yet there is no place in here that says that PK Finans gets title?

A. No.

(Tr. 745/2–17). Thereafter, Mr. Christophides continued in his insistence that PK Finans retained title to the equipment; however, defendants again could not verify this story with documentary evidence:

Q. [by Mr. Flicker] At the point that you feel that PK Finans owned the units at the time that you entered into the loan with them, correct?

A. [by Mr. Christophides] Right.

Q. In order to pay off the loan though you were selling units, is that true?

A. Correct.

Q. Now, tell me, am I correct that you were selling units owned by PK Finans?

A. Correct.

Q. Now, how does that work?

A. In every instance I asked for their permission and in every instance I gave them the check, I have a record of that.

Q. You have a record of asking their permission?

A. Yes, I do and I have a record of every check that came in which was given to them directly.

Q. And you don't have that here?

A. No.

(Tr. 753/15–754/8).

45. Mr. Christophides testified that the four Flexi–Van flatbeds had been in Trident Shipping's facility for "many years, let's say four, five or six at least." In that regard, Mr. Christophides denied that Flexi–Van put either him or his company, Trident Shipping, on notice that the four flatbeds belonged to Flexi–Van. He as-

serted that had he known that the units belonged to Flexi–Van, he would not have sold them to Mr. Rhodes. (Tr. 714/20–715/13). This testimony, however, is directly contradicted by the fact that Flexi–Van, and even Mr. Rhodes, had only one year earlier notified Trident Shipping that the four flatbeds belonged to Flexi–Van. (*See* ¶ 29, *supra*). In fact, even Constellation Navigation's former Container Manager, Mr. Shah, testified that Constellation Navigation was aware that there was Flexi–Van equipment in its possession at the Trident Shipping facility. (*See* ¶ 30, *supra*).

46. Finally, Mr. Christophides has himself acknowledged that the Flexi–Van equipment which he sold to Mr. Rhodes was not his to sell. (Tr. 771/17–772/2).

47. The court notes that because the four units in question, GIL–18736, GIL–18752, GIL–20190 and GIL–20199, were recovered by Flexi–Van on January 13, 1992, all four appear on Flexi–Van's list, dated January 10, 1992, of 89 unrecovered units under the lease to Pharos Lines. (*See* Ex. 4, 18, 19).

2. *Equipment Recovered from JFP in Miami*

48. Another recovery situation developed when Flexi–Van was contacted by the Florida Highway Patrol about equipment that it had seized from a company in Miami called JFP. It seems that JFP was operating with stolen equipment from which the indicia of ownership had often been removed. Flexi–Van was asked to assist the police in determining who owned the equipment. Therefore, Mr. Long went to Miami to help. It turned out that some of equipment was owned by Flexi–Van and under lease to Pharos Lines. Some of the equipment belonged to other leasing companies, which was returned, and some units could not be identified. (Tr. 115/20–116/22; 117/9–15).

49. When Flexi–Van learned that units on lease to Pharos Lines were located in the JFP facility, Flexi–Van notified Constellation Navigation. Specifically, Mr.

Vaughan notified Mr. Shah and suggested that Mr. Shah go to Miami "because there were very many units and it might be possible there would be other Constellation units." (Tr. 116/23–117/4). As Mr. Vaughan testified, it was in the interest of both Flexi–Van and Pharos Lines for Mr. Shah to attempt to recover the equipment. (Tr. 117/20–118/1). Accordingly, Mr. Shah did go to Florida. (Tr. 117/18–20).

### 3. *Equipment Held at Davis Transportation*

50. Another recovery effort developed in January 1991 when Flexi–Van's Mr. Long learned that Flexi–Van equipment on lease to Pharos Lines was located on the premises of Davis Transportation. The equipment had previously been located at the Charleston Port Terminal, but the South Carolina Port Authority had insisted that Pharos Lines remove the equipment from the terminal. Thus, Pharos Lines hired Mr. Jim Davis, the owner of Davis Transportation, to move the equipment on to his property and to store and repair the equipment. That move took place some time in 1989. However, Pharos Lines never paid Davis Transportation for the move, despite's Mr. Davis' attempts to obtain payment from Pharos Lines, Constellation Navigation and Trident Shipping. Instead, Pharos Lines abandoned the equipment and left it to remain on Davis Transportation's premises. (Ex. 8; Tr. 96/9–97/24; 616/21–617/7).

51. When Flexi–Van's Mr. Long discovered the equipment at Davis Transportation, Flexi–Van first confirmed that it was Flexi–Van equipment and then asked for it back. Mr. Davis responded that he would not release the equipment since Pharos Lines/Constellation Navigation still owed him $6,000.00 for moving and storage costs. Mr. Davis demanded that Flexi–Van pay the $6,000.00 before he would release the equipment. (Ex. 8; Tr. 96/9–97/24; 104/3–108/16; 244/12–16; 249/23–250/6). Thus, Flexi–Van was compelled to deal with a situation where its equipment had fallen hostage to a storage facility that asserted liens against the equipment, which

liens Constellation Navigation had allowed to accrue. The existence of these liens was in violation of ¶ 2 of the Terms and Conditions of the Lease Agreement. (Ex. 1).

52. Flexi–Van did not pay the $6,000.00, but did contact Constellation Navigation to demand that Constellation Navigation take steps to effectuate the release of the equipment. Constellation Navigation responded that they would not expend any efforts whatsoever to obtain the release of the equipment. (Tr. 108/12–109/21; Ex. 8). As far as Flexi–Van knows, the equipment remains at Davis Transportation. (Tr. 110/4–6; 249/23–250/6).

53. The court finds that Flexi–Van should have paid the $6,000.00 to mitigate its damages.

### F. Defendant's Counterclaim

#### 1. *The Agreement*

54. In November 1986, Flexi–Van appointed Pharos Lines as its agent to secure the return to Flexi–Van of containers, chassis and tractor equipment then owned by Flexi–Van which had been abandoned in Romania by a third party, Prudential Lines, Inc. ("Prudential Lines"). Prudential Lines was the lessee of the equipment in question and has gone into bankruptcy. (Ex. 9; Tr. 14/1–15/3).

55. The parties' agreement provided that Pharos Lines, upon taking possession of any Flexi–Van equipment in Romania, would have free use of the equipment to carry cargo from Romania back to the United States. In addition, Flexi–Van would credit Pharos Lines' arrearages (under the Lease Agreement) in an amount up to $250.00 per 20 foot container and up to $350.00 per 40 foot container in order to cover the costs incurred by Pharos Lines in Romania in effecting the release of the equipment. Pharos Lines was to check with Flexi–Van before actually committing Flexi–Van to effectuate the release of any equipment. (Ex. 10; Tr. 17/13–20).

56. This initial recovery agreement was negotiated solely by Pharos Lines' then President, Mr. Kulukundis, and Flexi–Van's Executive Vice President, William

Burns. (Tr. 11/6–13/12; 8/6–9; 9/2–6; 657/3–15).

57. The amounts agreed to for covering Pharos Lines' costs were subsequently modified to maximums of $360.00 per 20 foot container and $520.00 per 40 foot container. (Ex. MM).

58. Mr. Burns testified that the parties' agreement called for the equipment recovered by Pharos Lines in Romania to be delivered by Pharos Lines to a Flexi–Van depot in the United States in order for Pharos Lines to be given a credit against arrearages under to the Lease Agreement. (Tr. 17/21–19/3). This delivery requirement was not explicitly included in either of the first two documents concerning the agreement. (*See* Ex. 9, 10). However, Exhibit 9 states that Pharos Lines is appointed "as Flexi–Van [sic] agent to secure the *return* of Flexi–Van containers...." (Emphasis added). Additionally, Exhibit 10 states that "Flexi–Van will also extend sufficient free time to Pharos Line [sic] on equipment for their use *back to the U.S.*" (Emphasis added). Moreover, the delivery requirement was corroborated by a telefax Mr. Burns sent to Mr. Kulukundis on April 1, 1987. In discussing 46 Flexi–Van containers that Pharos Lines had recovered in Romania and was in the process of transporting to the United States, Mr. Burns' message stated: "As soon as these units are *back in our possession,* we will credit the Pharos Line [sic] account...." (Ex. 11) (emphasis added).

59. Based upon the implication of the initial documents concerning the agreement (Ex. 9, 10), Mr. Burns' corroborating telefax (Ex. 11) and, most importantly, on the unrebutted testimony of Mr. Burns (Tr. 17/21–19/3), the court finds that the agreement included a delivery requirement whereby Pharos Lines would receive credit against arrearages only when equipment was delivered by Pharos Lines to a Flexi–Van depot. The court finds it noteworthy that Mr. Kulukundis, who negotiated the agreement for Pharos Lines (Tr. 657/3–15), did not testify at trial to refute Mr. Burns' understanding of the agreement. More-

over, defendants do not cite deposition testimony to the contrary.

### 2. *Pharos Lines' claim*

60. In its counterclaim, Pharos Lines asserts that it recovered Flexi–Van containers from Romania as per the agreement and that Flexi–Van, therefore, should have credited Pharos Lines' account for $44,093.36 to cover charges incurred by Pharos Lines. (Ex. 12, E).

61. The sum of $31,306.36, which represents most of Pharos Lines' purported charges, is referred to in a March 24, 1987 letter from Mr. Alouf of Pharos Lines to Stephen Chopek of Flexi–Van. In that letter, Pharos Lines states that it had recovered 46 Flexi–Van containers in Romania. A Schedule of Vessels attached to the letter lists each of the 46 containers, along with the charges incurred by Pharos Lines in effecting their release, any stevedore charges and the location of each container. (Ex. 12; Tr. 634/19–635/2).

62. However, the amount which Pharos Lines demanded that it be credited, $31,306.36, well exceeded the maximum credit allowed to Pharos Lines for recovery expenses under the agreement with Flexi–Van. (Ex. 12). Based upon the agreed upon maximums of $360.00 per 20 foot container and $520.00 per 40 foot container (Ex. MM), the maximum credit Pharos Lines would receive from Flexi–Van for returning 46 units, depending on the relative number of 20 foot and 40 foot containers, would be between $16,560.00 and $23,920.00.

63. Mr. Burns testified he believed Pharos Lines' invoice was sent to Flexi–Van in error. He thought that the invoice included additional charges which were not part of the agreement. He also was not aware of any Flexi–Van containers that had been returned to Flexi–Van by Pharos Lines from Romania. Based upon this belief, Mr. Burns called Mr. Kulukundis and discussed the matter with him. At that point, Mr. Kulukundis suggested that Mr. Burns return the invoice to him which Mr. Burns did. (Ex. 12; 24/8–14; 25/18–28/8).

64. Meanwhile, Constellation Navigation's Mr. Alouf testified that the agreement continued to evolve from its conception in November 1986 to its termination on April 1, 1987. In the aforementioned April 1, 1987 telefax from Mr. Burns to Mr. Kulukundis, Flexi–Van notified Pharos Lines that Flexi–Van had sold its container fleet to ITEL Containers International Corporation ("ITEL"), effective March 31, 1987. Accordingly, Flexi–Van instructed Pharos Lines to discontinue its recovery efforts on behalf of Flexi–Van with respect to the equipment in Romania. (Ex. 11; Tr. 22/21–23/4; 24/4–7). Mr. Alouf stated that after Mr. Kulukundis went to Romania in late 1986, the Romanians demanded additional storage charges. Mr. Alouf testified that he notified Flexi–Van's Mr. Chopek of the additional charges and that as he received the bills he would pass them on to Flexi–Van. (Tr. 662/5–663/11).

65. The court finds that at the time of the discussion between Mr. Burns and Mr. Kulukundis in early April 1987, Mr. Burns' actions on behalf of Flexi–Van constituted a rejection of Pharos Lines' demand for payment. The court also finds that Mr. Kulukundis' actions indicated that Pharos Lines knew it had either requested excessive credits or had failed to fully perform under the agreement by not delivering the 46 containers to Flexi–Van's depots.

66. In fact, Pharos Lines provided little evidence that the 46 containers recovered in Romania were delivered to Flexi–Van's depots in accord with the parties' agreement. Constellation Navigation's Mr. Alouf testified that Flexi–Van had only actually taken delivery of the six containers marked "redelivered" on the Schedule of Vessels, units numbered UFCU 228002–2, UFCU 232933–2, UFCU 223824–9, UFCU 282468–2, UFCU 226705–7 and UFCU 281317–9. (Tr. 665/22–666/23; Ex. 12). While it seems from the Schedule of Vessels that Pharos Lines shipped the remaining Flexi–Van containers to the United States, most of these containers seem to have been left at the ports of discharge with various terminal or stevedoring facilities. (Ex. 12).

67. Furthermore, notwithstanding whether or not Pharos Lines has proved that it "redelivered" Flexi–Van containers to Flexi–Van's depots, the evidence establishes that Pharos Lines is in some cases attempting to recover from Flexi–Van amounts that have already been paid by ITEL. Particularly, ITEL issued to Pharos Lines' a number of credits relative to Pharos Lines' recovery of containers that were part of the fleet that Flexi–Van sold to ITEL. Credits in the amount of $400.00 each were issued with respect to units numbered UFCU 238252–8, UFCU 240368–3 and UFCU 242118–3; credits in the amount of $250.00 each were issued with respect to units numbered UFCU 283880–8, UFCU 366570–7, UFCU 384414–8, UFCU 388315–0, and UFCU 618305–7. (Ex. 22). Each of these eight units for which Pharos Lines received credit is identified in the list of units that Pharos Lines purportedly recovered from Romania and delivered to Flexi–Van and for which Pharos Lines is seeking damages from Flexi–Van. (Ex. 12).

68. However, none of these units is among the six units that seem to have been actually "redelivered" to Flexi–Van. (Ex. 12).

69. Based upon this evidence, the court finds that Pharos Lines has proved that it fulfilled its duties under the agreement as to the six units "redelivered" to Flexi–Van and that Pharos Lines should have been credited accordingly. The court notes that Mr. Burns testified that he was unaware of any Flexi–Van containers that were returned from Pharos Lines (Tr. 27/6–7; 27/18–20; 28/2–5), but finds that Mr. Burns' purported lack of knowledge does not sufficiently rebut Pharos Lines' documentary evidence (Ex. 12).

70. Pharos Lines claims it should be credited for $589.00 in release charges as well as $218.62 in stevedore charges for each of the six containers which would amount to $4,845.72. (Ex. 12). Since Flexi–Van offered no evidence to rebut Mr. Alouf's testimony that he notified Flexi–Van's Mr. Chopek of the additional storage charges in Romania (*see* ¶ 64, *su-*

*pra* ), the court finds that Flexi–Van approved the $589.00 in release charges for each of the six containers. However, stevedore charges were not part of the original agreement, nor did Pharos Lines provide evidence that Flexi–Van approved stevedore charges in this case.

71. Therefore, the court finds that Pharos Lines shall receive credit for $589.00 for each of the six containers, totalling $3,334.00.

72. The other $12,787.00 which Pharos Lines claims it should have been credited for returning to Flexi–Van containers from Romania is documented in a bill which Constellation Navigation received from Romtrans, the Romanian company that had dealt with Prudential Lines' containers. According to Pharos Lines, either Pharos Lines or Constellation Navigation paid Romtrans $12,787.00 in order to take possession of the 22 containers listed on the bill and return them to the United States. (Ex. E; Tr. 636/15–22; 637/1–3).

73. The court notes that Pharos Lines admits that only $8,835.00 of the charges reflected on the bill relate to Flexi–Van containers. (Ex. E; Tr. 636/23–36/25). The court also notes that 13 of the 15 containers listed on the bill are also listed among the 46 containers listed on the Schedule of Vessels in Exhibit 12. In other words, for the most part, Exhibit E duplicates Exhibit 12. Since the court has already dealt with the 46 containers listed on Exhibit 12, the court need only concern itself at this point with the two unduplicated containers listed in Exhibit E, UFCU 218270–4 and UFCU 227926–9.

74. As to UFCU 218270–4 and UFCU 227926–9, the court is unaware of any evidence that these containers were delivered to Flexi–Van. Thus, the court finds that Pharos Lines failed to prove it fulfilled its duties under the agreement as to these two containers.

3. *Equipment in Turkey*

■ 75. Pharos Lines also claims to be owed $3,429.50 for funds expended in its recovery of Flexi–Van units in Turkey. (Ex. H; Tr. 637/19–638/24). According to

Pharos Lines, the Turkey agreement was based on a telephone call between Pharos Lines' Mr. Alouf and Flexi–Van's Mr. Chopek. (Tr. 659/19–660/4; 661/10–19).

76. Mr. Alouf conceded that there existed no writing confirming the purported agreement regarding equipment in Turkey. (Tr. 661/6–661/9). However, Mr. Alouf's testimony was corroborated by the bill dated March 24, 1987 which Pharos Lines submitted to Flexi–Van discussing the charges Pharos Lines incurred in obtaining the release of certain equipment in Turkey. (Ex. H).

77. Based upon the corroborating bill (Ex. 11) and, more importantly, on the unrebutted testimony of Mr. Alouf (Tr. 17/21–19/3), the court finds that Flexi–Van and Pharos Lines did have an agreement whereby Pharos Lines would receive credit against arrearages for containers returned from Turkey. The court finds it noteworthy that Mr. Chopek, who negotiated the agreement for Flexi–Van (Tr. 657/3–15), did not testify to refute Mr. Alouf's understanding of the agreement.

■ 78. Defendants offered no evidence of the amount Flexi–Van would credit Pharos Lines' arrearages (under the Lease Agreement) in order to cover the costs incurred by Pharos Lines in Turkey in effecting the release of the equipment. Since the containers in Turkey, once returned, were worth the same amount to Flexi–Van as the containers returned from Romania, and since Flexi–Van was willing to pay a maximum of $360.00 per 20 foot container and $520.00 per 40 foot container to recover containers from Romania (Ex. MM), the court finds those same amounts apply to the containers in Turkey.

79. It is unclear from the bill Pharos Lines submitted to Flexi–Van for containers returned from Turkey how many containers were recovered. The bill refers to "TL 1549505," which appears similar to the identification number normally used to describe containers. This single reference seems to imply that only one container was recovered. However, the bill also refers to two invoices (not provided) which could im-

ply that two or more containers were recovered. (Ex. H).

80. Since the court has no basis for finding that any more than one container was recovered, and since the burden was on defendants to prove otherwise, it finds that Pharos Lines' bill refers only to one container. Similarly, since the court has not been provided any evidence of whether the recovered container was 20 or 40 feet, the court must construe the evidence in favor of Pharos Lines and assume the container was 20 feet, corresponding to a credit of $360.00.

## G. Damages

81. Flexi–Van claims damages as of December 31, 1991 consisting of:

(1) Per diem rental fees from March 1990 forward for accelerated rental charges that have not been paid by defendants and additional rental charges that have accrued and that are presently accruing on equipment that had not and/or has not been returned to Flexi–Van: $317,000.00;

(2) Unpaid repair charges on units that have been returned to Flexi–Van: $52,000.00;

(3) Unpaid casualty value charges for 89 units that have not been returned to Flexi–Van: $475,000.00;

(4) Interest at 15% per annum on all outstanding amounts as authorized by ¶ 6 of the Terms and Conditions of the Lease Agreement; and

(5) Attorney's fees as authorized by ¶ 9 of the Terms and Conditions of the Lease Agreement.

(Tr. 441/11–446/20). Flexi–Van claims the elements of liquidated damages set forth above, totalling $844,000.00, plus presently accruing per diem charges on all units which have yet to be returned to Flexi–Van, plus interest at 15% per annum, plus attorney's fees.

82. In reviewing the parties' submissions, the exhibits and the record, the court notes that Flexi–Van has supplied the court with only conclusory damages figures. Flexi–Van has not provided the court with evidence in the form of charts and/or calculations to support the amounts of liquidated damages claimed, nor has Flexi–Van provided the court with any basis for quantifying its claims for presently accruing per diem rental fees, interest and attorney's fees.

83. Flexi–Van states in ¶ 13 of its proposed conclusions of law that "the quantum of presently undetermined damages will be identified through a separate submission on behalf of Flexi–Van." Since the court requires evidence in the form of charts and/or calculations to support Flexi–Van's damages claims, the court has filed an Order concurrently with these Findings of Fact and Conclusions of Law that directs Flexi–Van to submit such evidence to the court by June 26, 1992.

84. As the court noted in ¶ 47, *supra,* Flexi–Van's damages claims do not address the fact that it recovered four Flexi–Van units from Trident Shipping. Additionally, the court has found that Flexi–Van failed to mitigate its damages when it refused to pay Davis Transportation $6,000.00 to release its equipment then on lease to Pharos Lines. *See* ¶¶ 50–53, *supra.* Thus, Flexi–Van is directed to address these issues in its submission.

85. On defendants' counterclaim, the court awards a total of $3,694.00.

## III. Conclusions of Law

1. The bases for federal jurisdiction in this case are admiralty and maritime jurisdiction within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and diversity of citizenship jurisdiction under 28 U.S.C. § 1332.

2. By virtue of ¶ 12(e) of the Terms and Conditions of the Lease Agreement, Flexi–Van's claims against Pharos Lines are governed by New York law. This choice of law provision in the Lease Agreement is enforceable under § 5–1401(1) of the New York General Obligations Law. Flexi–Van's claims against Constellation Navigation are also governed by New York law on the ground that this case bears the most significant relationship to New York insofar as Constellation Navi-

gation is domiciled in New York and the Lease Agreement under which Constellation Navigation acted as Pharos Lines' agent was executed in New York. *See Auten v. Auten,* 308 N.Y. 155, 124 N.E.2d 99 (1954).

■ 3. Upon execution of the Lease Agreement, Pharos Lines constructively took possession of the units listed in the Lease Agreement. The Lease Agreement placed the burden on Pharos Lines to take possession of the equipment from the locations it was last placed by the previous lessee. Flexi–Van was under no affirmative duty to physically deliver the equipment to Pharos Lines.

4. Pharos Lines defaulted under the Lease Agreement on March 20, 1990, thereby enabling Flexi–Van to exercise its rights to terminate the Lease Agreement and to pursue all remedies available to it under the Lease Agreement.

5. Pharos Lines has converted over eighty units of Flexi–Van's equipment.

■ 6. The plain language of ¶ 3 of the Terms and Conditions of the Lease Agreement provides that the "Lessee shall pay to Lessor an amount equal to the casualty value" of any equipment that is destroyed, stolen or lost while on lease to Pharos Lines. (Ex. 1). Flexi–Van's recovery in this regard would not be limited to the market value of the equipment. Consistent with the terms of the Lease Agreement, Flexi–Van's recovery of damages occasioned by Pharos Lines' conversion of the leased equipment should be assessed at the casualty value of the equipment. The equipment's casualty value reflects the actual loss sustained by Flexi–Van since the casualty value is a reflection of the amount that Flexi–Van would have received from its lease of the equipment had the equipment been available for lease over its entire life expectancy. The recovery of the equipment's market value alone would not make Flexi–Van whole. Therefore, damages assessed against Pharos Lines and Constellation Navigation for their conversion of the leased equipment should derive from the casualty value of the equipment.

■ 7. In general, Flexi–Van mitigated its damages by taking extensive and significant steps to recover its equipment after it terminated the Lease Agreement. However, in the case of Davis Transportation, Flexi–Van abrogated its duty to mitigate damages when it refused to pay Davis Transportation $6,000.00 to release Flexi–Van equipment on lease to Pharos Lines.

■ 8. At all times relevant to this action, Constellation Navigation exercised exclusive and complete dominion, control and management over Flexi–Van's equipment that was leased to Pharos Lines under the Lease Agreement. As such, under New York law Constellation Navigation owed a duty of care to Flexi–Van with respect to its dominion, control and management of Flexi–Van's equipment. *See infra.*

■ 9. Constellation Navigation breached its duty of care to Flexi–Van in that it negligently failed to adequately monitor the whereabouts and otherwise maintain and safeguard Flexi–Van's equipment. It is well-settled under New York law that "[a]n agent is responsible for his own tortious acts, notwithstanding the agency relationship and regardless of whether the principal is also liable." *Hotel Constructors v. Seagrave Corp.,* 99 F.R.D. 591, 592 (S.D.N.Y.1983) (citing *Jones v. Archibald,* 45 A.D.2d 532, 360 N.Y.S.2d 119, 122 (4th Dep't.1974); *Rhynders v. Greene,* 255 A.D. 401, 8 N.Y.S.2d 143, 144 (3d Dep't. 1938)).

■ 10. The conduct of Constellation Navigation in this case is analogous to the situation where a realty managing agent undertakes the sole and complete control and management of a principal's premises. In such a case, if the principal has the duty or obligation to make repairs and if the principal gives to his agent (and the agent accepts) the power, authority and responsibility to make such repairs as if he were controlling the premises on his own account, the agent's liability for negligence would embrace nonfeasance (i.e., failing to make the repairs) as well as misfeasance (i.e., making faulty repairs). *Michaels v.*

*Lispenard Holding Corp.*, 11 A.D.2d 12, 201 N.Y.S.2d 611, 614 (1st Dep't.1960).

11. The rule of law set forth in *Michaels, supra,* is not limited to situations involving a realty agent who maintains exclusive and complete control and management of its principal's property. The New York courts have indicated that this legal principle is applicable to any agency, whether or not the agency involves the management of realty. *Jones v. Archibald,* 45 A.D.2d 532, 360 N.Y.S.2d 119, 122 (4th Dep't.1974) (citing *Michaels, supra*). Therefore, where an agent has assumed exclusive and complete control and management of its principal's affairs, as if the agent were acting on his own account, then the agent is liable for damages to third persons occasioned by the agent's breach of a duty to the third person that arose out of the agent's assumption of authority and responsibility over its principal's affairs.

12. Since Constellation Navigation in this case undertook the exclusive and complete control and management of the leased equipment, and accepted from Pharos Lines the delegated duty to Flexi–Van to maintain and safeguard the leased equipment and to effect the timely payment of rental payments to Flexi–Van, it follows then that Constellation Navigation is liable to Flexi–Van for damages arising from its breach of this duty.

13. Constellation Navigation has converted over eighty units of Flexi–Van's equipment.

14. Since in New York the established rule of law is that an agent who converts the property of a third party is liable for such conversion, *KOUS–TV, Inc. v. Spot Time, Ltd.,* 599 F.Supp. 90 (S.D.N.Y.1984) (citing *R.L. Rothstein Corp. v. Kerr Steamship Co.,* 21 A.D.2d 463, 251 N.Y.S.2d 81 (1st Dep't.1964)), Constellation Navigation in this case cannot hide behind the legal fiction of its capacity as an agent. Constellation Navigation is liable to Flexi–Van for damages occasioned by its conversion of Flexi–Van's equipment.

15. Pharos Lines is liable to Flexi–Van in an amount which will be determined after Flexi–Van has provided the court with evidence in the form of charts and/or calculations to support its damages claims. *See* Findings of Fact ¶ 83, *supra.*

16. Flexi–Van is liable to Pharos Lines for $3,334.00 for charges associated with the recovery of equipment in Romania and $360.00 for charges associated with the recovery of equipment in Turkey, totalling $3,694.00.

SO ORDERED.